SAMPLE #2



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA.

NOV 1 4 2017

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

① OKLAHOMA KEEPERS

② E.L. DUGAN
③ M.W. DUGAN
④ H.L. DUGAN
⑤ C.I. DUGAN    **Plaintiff(s)**
⑥ F.C. DUGAN

vs.

CIV 17 - 1221  R

CASE NO._____

① STATE FARM INSURANCE;
(INDEMITY, ET. AL)

**Defendant(s)**

② BLUE CROSS AND BLUE SHIELD
OF OKLAHOMA, TEXAS

**COMPLAINT**

(HEALTHCARE SERVICE CORPORATION
AND OTHER LEGAL RESERVES; ETAL)

③ COMMUNITY CARE OF OKLAHOMA
(AND OTHER LEGAL RESERVES, ETAL)

④ O.U. PHYSICIANS / LYNN MITCHELL ET AL

⑤ CITY OF BROKEN ARROW, OK AND OFFICE OF MANAGEMENT AND ENTERPRISE SERVICES
AND OTHERS NAMED IN THE COMPLAINT, BY OTHER DEFENDANTS AND IN SUBSEQUENT ET AL
DISCOVERY TO INCLUDE BUT NOT LIMITED TO:

⑥ UNITED HEALTH CARE, and other legal reserves

⑦ MARY FALLIN / JEAN ROUPE  GOVERNORS OFFICE  STATE OF OKLAHOMA;

⑧ ST JOHN TULSA, OK  RISK MANAGEMENT

⑨ DR J W HENDRICKS as medical pediatric director Blue Cross & Blue Shield

⑩ DR. STEVE SNYDEN, as current Healthcare Delivery Blue Cross Blue Shield
Healthcare Delivery

⑪ JONI POST DPH, as current specialty pharmacy director Blue Cross Blue Shield

⑫ JATIN MISTRY, Water Quality EPA

⑬ NICOLE FOSTER  OF THE ENVIRONMENTAL PROTECTION AGENCY.
water quality division

⑭ GEORGE PETTIGREW / AGENCY FOR TOXIC DISEASE REGISTRY
Health and Water Quality, Director

NOTE:  *Your signature, address and phone number must appear at the end of each pleading.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF OKLAHOMA**

_____

**SHORT CAPTION:** OKLAHOMA KEEPERS v STATE FARM, BLUE CROSS, COMMUNITY CARE, ET AL.

**PLAINTIFFS:**

OKLAHOMA KEEPERS,

as a group name on behalf of themselves as a plaintiff family, effected extended family members and others in their communities similarly situated to include but not limited to

E. L. DUGAN, PRO SE

by herself at age 46 as an individual victimized/defamed/infringed upon and parent, mother, wife, advocate and/or next friend to other plaintiffs

M. W. DUGAN, PRO SE

by himself at age 46 as an individual victimized/defamed/infringed upon and parent, father, husband, advocate and/or next friend to other plaintiffs

H. L. DUGAN (maiden name in relevance), PRO SE

by herself now at age 21 as an individual victimized and exploited/defamed/infringed upon prior to the age of majority and now. Sibling, oldest daughter, advocate and next friend to other plaintiffs

C. I. DUGAN, PRO SE

by himself now at age 19 as an individual victimized and exploited/defamed/infringed upon both as a minor, prior to and at/after the age of majority and/or with his parents and next friends/guardian ad litem when acutely or severly ill, less functioning or not willing to serve as his own guardian or with fact confusion due to prolonged systemic physical illness and facts that occurred during childhood. Sibling, son, advocate and next friend to other plaintiffs

F. C. DUGAN, PRO SE

Now at age 12, by her parents next friends/parents and guardians ad litem and herself as a minor victimized and exploited/possibly defamed/infringed upon. Sibling, youngest daughter, advocate and next friend to other plaintiffs

**DEFENDANTS:**

STATE FARM MUTUAL INSURANCE CO., its agents, servants, and/or employees; STATE FARM INDEMNITY CO., BLOOMINGTON ILLINOIS its leaders, decision makers for coverage, agents, servants, and/or employees;

BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, its agents, servants and/or unnamed employees; to include but not limited to its Companies in the state of Illinois, the state of Texas and the state of Kentucky and other past or newly created legal or mutual reserve type companies, HCSC et. al. Its leaders, decision makers for coverage, all plaintiff relevant medical directors and superintendents to include UnitedHealthcare and kinship Healthcare Marketplace companies;

CommunityCare of OKLAHOMA, CommunityCare, Inc., owned cooperatively by St. John and Saint Francis Health Systems in Tulsa, OK, its agents, servants, legal reserve type companies, employees or legal reserve affiliatons to its network providers to include but not limited to Plico a MedPro Group / Berkshire Hathaway company;

**DEFENDANTS CONTINUED:**

CIVIL ACTION NO:

CLASS ACTION

COMPLAINT

CRIMINAL ACTION APPROVAL NO:

CLASS ACTION COMPLAINT

OU PHYSICIANS TULSA AND OU PHYSICIANS OKLAHOMA CITY, its risk managers, leaders, agents, servants and/or employees;

Mary Fallin as Governor of the State of Oklahoma and agencies/offices/commissions of the State of Oklahoma separate and together with the City of Broken Arrow, Oklahoma Ordnance Works Authority, Broken Arrow Public Schools and Norman Public Schools;

The Social Security Administration, The National Institute of Health, Internal Revenue System, Environmental Protection Agency, Federal Trade Commission and Department of Labor of the U.S. SPECIFIC TO BAD ACTORS IN TULSA, OK; MOORE, OK; OKLAHOMA CITY, OK; SALT LAKE CITY, UT; AND FALLS CHURCH, VA and other areas brought to light in discovery and who directed their bad actions;

Arvest Bank, Norman Branch and other banking subsidiaries or agencies brought to light and possibly with the Federal Reserve associates who now infiltrate the plaintiffs local credit union with at least one instance of bank fraud as intent to harm the plaintiffs' health insurer contract;

and any others named in this complaint's predicate acts and as yet undiscovered parties or entities, related to this action, that may come to light in subsequent discovery.

### I.  INTRODUCTION AND SUMMARY

1. This is an urgent complaint and request to the United States District Court Western District of Oklahoma for immediate injunctive and declaratory civil relief; and separate due process to initiate the criminal division approval process for **RICO remedies authorized by the federal statutes at 18 U.S.C. §§ 1961-1968.**

2. The plaintiff family has been named Oklahoma Keepers for grassroots actions, privacy and to try to add a layer of protection to limit increased retaliation, more file duping, additional false alternate created fact and harassment.

3. **Problem Part One: Civil Relief** — There is a great need for immediate injunctive and declaratory relief because behind the scenes bureaucratic determinations for care differ from the true patient needs and a list of treating physicians/specialists who have agreed on the same diagnosis and needs for the plaintiff family as patients. The plaintiff family, to include the minor and now adult children are in dire need of care for medical necessity as stated by their treating physicians addressing findings especially after a known and proven toxic exposure.

4. **Problem Part Two: Criminal RICO** — The bureaucratic obstructions in care, false created alternate fact, patient dumping to try to make the family look like they have "a record" and minimizations of needs to make care appear not needed or of a behavioral cause; remain a consistent problem without resolve even with physician expert interventions which needs to be addressed and reprimanded with the court now. The problems are of organized crime and not of inept nature for the family.

5. From 2003-present, after the oldest child got sick and could not get better, family physicians became continually concerned about the healthy children's sudden and new development of chronic illness and referred the family to actively engage on a journey with tests and answers from specialists.

6. Particulars are required under Federal Rules of Civil Procedure (FRCP). **So this is the reason for particulars and length for this complaint.** As more than usual have taken on or dealt with chronic illness concerns **(five in this plaintiff family and pets)**, it is additionally been possible this filing for Oklahoma Keepers will illustrate in discovery and reconstruction of the timeline from at least 1990 to present as many as four deaths in their extended family they expect

are related and other deaths of friends, neighbors, associates and or their family members.

7. The son is currently filing this under age of majority statute of limitations which allows the family to reopen all details under the Civil Toxic Exposure if the court decides against RICO but subsequent pages will explain the need and precedent for RICO alone as a solution to the plaintiff family and community needs.

8. In 2008, four family members were diagnosed with a primary immune deficiency, it seemed the health insurance did not like the diagnosis and immediately started causing conflict or fact that the diagnosis had been missed with the oldest child having two previous hospitalizations without answer and findings hidden from the parents.

9. The continuity of care treating physicians proved the family was too sick with real physical concerns and not anything behavioral, so they felt collectively they had a duty to act regardless of insurer belief or blocks. The treating physicians kept moving the family against the insurance medical director's distress and imposed blocks in care to more specialists in the State of Oklahoma and eventually to experts in other States moving the children to higher levels of care. The illnesses remained real and diagnoses became confirmed with a care plan that remained consistently supported by expert physicians. All three children eventually became recurrently ill, under specialty care and continued to experience periods of wellness and illness in cycles until 2010-2011.

10. Dr. Bharat Sharma with the University of Oklahoma was the first to diagnose the oldest child after his colleagues in residency avoided the needed physical diagnosis during hospitalization and made unfounded assumptions instead about the then 8-year-old child. Sharma noted in the child's chart the distress of the insurance medical director in 2007 over testing to prove the diagnosis. After diagnosis and transfer to immunology specialty care, he had to write a letter fighting for treatment for the child to the same insurance medical director. But the relationship for the patient's payer remained abusive and futile toward the kind family with problems through the approval and treatment process posed by case managers Mary Fiery, Susan Dillard and another supervisor in their department which caused the new specialist to become distressed. Later Dr. Sharma suddenly died.

11. The plaintiffs, to include minor children, have been shown evidence and results of abnormal tests conducted by experts, continue to experience illness and life threatening episodes that dozens of referred to treating physicians agree on as the underlying diagnosis and co-morbid conditions.

12. As lead is not the only dangerous health factor and it has been proven even a once healthy child can end up with immune defects, metabolic/autoimmune disease and cancer in the same body. But the State and Insurers did not want this to be so, they wanted it portrayed that the family could not be this sick, leaving the children untreated without transparency with findings and in medical neglect by their health providers. This should help bureaucrats come to understand Flint Michigan is not the only state in health crisis with infrastructure and industry pollution problems. The plaintiff family's true health timeline worked through with the family who has been the reliable historians proves this. Oklahoma's environmental problems came to light in the plaintiff family's quest for answers, as conditions were not resolved.

13. In 2013, almost a decade after the plaintiff family's exhaustive medical journey began, **eight natural gas leaks** were found in the home and the family additionally was referred to medical toxicologists as was right for the patients only to learn there was still more to find.  The doctors advised the family to do environmental testing on their home and informed them about findings affecting health in Oklahoma and Texas being stored in old mines. Texas sends out the health department in these situations but Oklahoma had blocked this, stating the Governor had blocked jurisdiction and she refused Title 55 money to allow these services.

14. As the plaintiff family has spent three 401k plans, their savings their decade of paychecks to keep their children alive and thriving, they enlisted their home insurer to allow them to use their paid environmental rider that gave them another safe place to live in a hotel during testing of the home.

15. **Elevated levels in the plaintiff family home considered illegal at the time (May 31, 2012) by USEPA National Primary Drinking Water Regulations showed Bromodichloromethane at 23 times the regulated level and the accepted level on that chemical was 0 because it is highly known as a strong carcinogen.  Chloroform was found at almost three times the regulated level and it's safe level is 70 known to cause breathing and tissue damage to include damage that looks like alcohol overuse in the colon.  These compounds together are labeled in a class as Trihalomethanes and were found to be exceeding the maximum contamination level by almost two times which anything over the MCL is a highly probable cause of liver, kidney, central nervous system problems and increased risk of cancer, according to the letter.**  Months later the Oklahoma Department of Environmental Quality confirmed this was indeed high and staying high and coming from the City water line not just at the family's home, **confirmed with additional testing by the ODEQ and a letter dated August 3, 2012.** The finding levels were reviewed and **then linked by experts as the main cause of bodily injury to the plaintiff family as written to the EPA in a report dated December 31, 2012 by Monique Mills, MD a UT Southwest Pediatrician certified Environmental Physician assigned by Regional Poison Control through a grant that allowed her to do the writing and research work provided by the Pediatric Environmental Health Specialty Units (PEHSU).** She was a third party at that time that the family or no known acquaintance of the family had ever met.

16. However, the authorities abused positions of power to deny, fear or ignore scientific findings; changed the levels documented as illegal levels to look legal; used the plaintiff family's situation to start chloramines against the neighboring City's protest and facts against it being a solution; refused to add monitoring sites; did not specifically address the chemicals per expert recommendations in a new water plant; abolished or refused health response efforts and help for even their children; and ignored the duty to find or accurately admit how the chemicals became so elevated through the water line into the family's owned dream home as their most important piece of property. The authorities additionally chose to demonize, create assumptions and harm the children and family that has caused collateral damage and has led to this legal action.

17. Out of safety and need, with doctor proclaimed medical necessity, especially for the care of their children, the parents continue even today to search for a provider that refuses to be manipulated to harm the family or becomes retaliated against, retired or fired. Especially since forced physician firings started in 2012 when findings were reported to the Environmental Protection Agency but no

health response was issued to physicians in the community only a firing response to the plaintiff family physicians it seems.

18. As they find one who vows to do what is best for the patient instead of the insurer or the State, Oklahoma Keepers experience recurring patterns of organized crime from a tech, an office worker, financial worker varied culpable persons in related and non related health organizations such as utility workers and banking institutions which seemed unrelated to the plaintiff family until relationships were found in 2017. When traced back, the change in attitude and maladaptive behaviors from the staff are found to link to the rulings of a bureaucrat, as physicians have termed it, who comes in and distresses the physician, manager or staff in order to limit or block care and treatment to the family.

19. With threats of extortion in a limited health payer market, taking back insurance payments to the good doctor although the family is paying premiums for private insurance in example. This is planned and maliciously done against what is best for the patient in order to deny continued needs and true illness, to the point now even when it is life threatening or will soon become again. It is also used to sustain pain and suffering over a situation requiring medical attention in a sort of torture. No matter if it is over children or adults. The fact that it is also happening through veterinarians with no private insurance too now, proves the problems are not just coming direct from the insurer but linked with the State, and would not be surprising if the State has falsely involved the Federal but hides under state protections as a double standard which can further illustrate the charges of RICO proposed.

20. The years of care needs from the contamination and stolen resources from the family during continued patterns of racketeering prevent them from just paying for what they need as they have now been forced to live a decade of life overcoming a prognosis in their son and solving damage in all family members and pets from neglectful practice of those in federal and state capacities who were charged with protecting the public interest as a job, as their career. Some would say they had the public's interests by securing jobs, but it should be proven if a good portion of the public loses function, quality of life, becomes too sick to work, must care for multiple family member's too sick to work or their family members die how can jobs come above health. The health response should have occurred but did not.

21. Thankful for good past physician relationships that kept most family members alive, as answers came so did retaliation and deceit wrongly put on the plaintiff family. The retaliation sought to take away or rewrite fact with fraudulently created alternate fact by multiple culpable persons as bad actors. It continues to feel like the plaintiff family's endangered lives are not their own and they remain punished for the truth their experts have found, under poverty now although still insured often left ill under what has often felt like house arrest to deal with their health problems and symptoms wondering how to find support for the next downturn continuing collateral damage; recurring although denied illness; infection; and physical change are apparent and true beyond denial. Other families suffering with similar illness concerns are not treated with retaliation because they do not have findings or less affected members in their family with costly needs.

22. In prolonged illness, the family painfully had to learn of and watch the cause they found grow into more affect under the incompetent response of officials, regardless of warnings to the Environmental Protection Agency (Jatim Mistry and

Nichole Foster as the known bad actors) and the City of Broken Arrow as the EPA let the City select its own monitoring sites. The City and agency refused to consider the plaintiff mother's request to at least add a monitoring site. Investigations of wrongful deaths seemed to show the agency's refusal to act likely exposed other states and caused deaths through organics mixing with the elevated inorganics, causing food products from a plant near the family's home to also become contaminated.

23. As seen in Flint Michigan and other communities, the ignored complaints that came from experiences and findings have grown as well into problems more widespread linked to the deteriorating health and increase in health needs in their communities. Through legal discussions with public interest law schools and research, the family has also become aware of how the found chemicals were used to clean hydraulic fracturing chemicals from the water and how Superfund site ground water chemical run off serves as another possibility to further contaminating their water through broken infrastructure and an understanding of how that occurs in the water delivery systems shared by the City of Broken Arrow.

24. In this case as this demand for justice must be allowed to prevail, it can be found that repeatedly over years the parents have given every last fabric of their material lives and their own well being to save their children over and over again as their only goal. That trail of seeking answers and then finding more help has become a long timeline of evidence supporting the real illnesses of the family, damages caused to especially the children's physical growth and development on the fault of the Insurers for Home, State or Health, the cooperating providers and the State supporting the marginalized, demonized, delayed and denied care actions and development and illustrating the patterns of bureaucrat and provider misconduct by different culpable persons against the family in fear and retaliation of the found truth.

25. Creating a preponderance of evidence for organized crime even if the motive was a means to preempt a defense. That created defense was against the People of the United States and the general welfare of this plaintiff family and others. Which is the opposite of the written intentions for the United States Constitution in the Preamble.

26. But no matter the fraudulent minimizations and found falsely created alternate facts made in a planned defense by the defendants and others to be found, the physical illnesses experienced recurrently by the plaintiff family remain, are serious and need appropriate attention. Facts about recurring health changes and findings in the plaintiff family do not cease to exist because they are covered up, minimized, changed, put with different parameters or ignored by those who are supposed to work in the public and patient interest, in health response and bring no harm or no continued harm to the patient, to include children.

27. On the plaintiff family's part, the reason to engage is not environmentalism, politics or beliefs but the facts that continue to be fact objectively, their continued undue suffering, more known despair created outside of previous illness or family disease experienced, their right and the rights of their children, for the public interest of their community and their community's pets, wildlife etc. right to a healthy life as protected by multiple State and Federal laws but ultimately as fundamentally has federal rights with Amendment XIV of the US Constitution under law.

II. VENUE

28. The Western District Federal Court of Oklahoma is the appropriate venue in this matter:

    a.  Plaintiffs currently reside, and have resided in Cleveland County, Oklahoma for approximately three (3) years; Cleveland County lies within where most recent predicate acts have occurred in the Federal Western District of Oklahoma.

    b.  The Parent companies of most defendants, do business in the State of Oklahoma and/or has representatives or were referred or assumed referred by representatives in The Western District or Northern District of Oklahoma.

    c.  There are more than usual conflicts of interest in the Northern District Federal Court in Tulsa advantaging either the plaintiff family or the key and current health insurer.

    d.  A change of venue to a different district is an option with discussion, for whatever reason to include but not limited to infiltration of possible corruption or actions to mislead in federal district courts, as long as not to cause plaintiffs extra economic hardship, physical distress and possible further physical injury to plaintiffs so that this case could not be litigated, and would negate, utterly, the pursuit of justice that has been so long awaited and continues to leave the children with damages in their growth for no reasons or behaviors of the parents or their own. There is a limited time for treatable healing and repair (son and youngest daughter are still growing for about two more years).

### III. JURISDICTION

29. Plaintiffs declare on personal event experiences, exhibit evidence, abnormal tests and findings by multiple field experts, recorded and/or transcripted events, witnesses and expert information and testimony, case law and precedent, proof and objectivity over just belief, and upon reasonable investigation of records research along with proof of connected organizations shown specifically sought to damage above or guided around the law, beyond and outside of toxic exposure duty to act responsibilities with shown causation making RICO remedies authorized by the federal statutes at **18 U.S.C. § § 1961-1968** the focus of this complaint. Home insurance and health insurance organizations held a duty to act for the plaintiff family as Oklahoma customers to the industry for near two decades. Insurance was found to be leading initially the pattern of events, that bred and led to political figures, expert finding of possible cause of illness, industries and social injustice for the plaintiffs and significant predicate acts in a ring of organized crime and racketeering in both related and unrelated industries with patterns to be shown from multiple culpable persons in businesses even without direct relation over a period of at least 10 years.

30. The plaintiffs are native Oklahomans who, throughout life, have only lived in Western District and Northern District Federal Court jurisdiction in Oklahoma. At present, the plaintiff family has lived in the Western District Federal Court jurisdiction in Oklahoma since 2014 where the most recent RICO predicate act events in 2017 have taken place against the plaintiffs, to include minor children, as it clearly seems why this district was selected to file in. Other patterns with varied culpable persons have knowingly occurred during continuity of care and

referrals to care in the states of Texas, Missouri, Maryland, Florida, needing federal jurisdiction to explore all of the problems and further in the Northern District of Oklahoma as originating in that part of Oklahoma in Tulsa and surrounding areas where all plaintiffs spent a majority of their lives as hard working, responsible, caring, productive citizens which in truth has not changed.

    a. Federal District court has additional jurisdiction by statute under

        i. **1. 18 USC § 1964(a)**

        ii. **1. 18 USC § 1963**

        iii. **28 USC § 1331** — district court in Cleveland County original small claim

        iv. **3. 28 USC § 1339** — postal matters mail fraud, and postal office misconduct

        v. **18 USC § 3509** — child victims and child rights

        vi. **28 US Code § 455 (a-f)** — for conflict of interest protection, misleadings

        vii. **Amendment XIV and Article VI US Constitutional Law** for property rights, liberty and quality of life these broken laws with predicate stole their healthy life and property;

        viii. Found so far without discovery if more particulars were not needed as those mentioned below.

31. As Pro Se litigants, guidance has been sought by other case laws, laws in general and precedent:

    a. **HAMMEL v STATE FARM, 1999 USD WD of NC No. 2:99-cv-44-T**, is the most representative Pro Se case the plaintiff family has selected to follow and asks the court to refer to it often in structure. It did not include growing children and the cause of injury was different but it alone shows precedent for the action that could pose a solution to cover all the family has and continues to forcibly go through. Key parallel areas illustrate how:

        i. The Plaintiff family also had a State Farm policy, 36CR91561 and associated policies, riders, etc. for auto, home and life. Auto since 1987 as a minor of legal driving age on her parents' policy and her parents had auto and home with the same agent over a decade prior. The plaintiff couple had cars and home insurance with the same State Farm agent since 1993 when the couple purchased their first home and married, they later added Universal Life until it was discontinued. It was the key asset that caused injury to the family (living in the insured home) vs. (the insured vehicle) in the case of **HAMMEL v STATE FARM.** Both plaintiff cases paid for insured status to protect their assets, protect their quality of life and have medical coverage that provides resolving care. In addition Oklahoma Keepers paid for an environmental rider purchased years ago because the mother knew she was highly allergic to mold and needed mold protections that traditional policies did not offer just in case.

        ii. **HAMMEL v STATE FARM** dealt with examples to illustrate how similar key players obstruct what the plaintiff needs to survive and recover, mitigate or maintain injury;

        iii. **HAMMEL v STATE FARM** told the story of how racketeering might be

> used, across multiple related and unrelated industries with
> different culpable persons;
>
> iv.  **HAMMEL v STATE FARM** similarly obstructed the justice for the care
> of the plaintiffs as is and has remained Oklahoma Keepers key
> concern and most important problem that needs to be solved next to
> resolving of stolen property rights, wages, career and benefits.
> Bellamente, a plaintiff of the case, has been consulted during the
> writing of this action. It was the favorable option that brought
> relief and stopped harassment according to Bellamente.
> In relief and recovery, the family has to prioritize right to life,
> as multiple family members still struggle day to day with illness
> some that is treatable but disregarded or the payer source denies at
> this time to include the children. Like **HAMMEL v STATE FARM**, Oklahoma
> Keepers remain left in denial of a dire medically necessary need for
> health services placing lives at risk over getting their property
> back then careers and damages for all of the losses.
>
> b.  In the areas of toxic exposure bodily damage and relief case law, more
> explanations of civil relief with similar community water problems and
> findings has parallel elements to recent filings for **Mays vs Snyder USDC
> ED of MI Case No. 15-14002 and 42 USC Sec 1983.** These current examples are
> in pre discovery in the state of Michigan. A Special Prosecutor reviewed
> and found abuses of power with failures or inappropriate actions with the
> duty to act, similar to and different from those suffered by the plaintiff
> family in Oklahoma. Similar to Michigan, factual elevated levels of
> Trihalomethanes, Haleoacteic Acids, Lead and crumbling infrastructure
> problems to include but not limited to cast iron and lead pipes as have
> been found in Oklahoma as a State with increasing levels of adverse health
> problems. Elevated levels of Arsenic, Chloroform and Hexavalent Chromium
> are some other adverse findings publicly shared through media reports of
> Oklahoma groundwater concerns that are known to cause adverse health
> problems. Health insurers have continued to exit the State of Oklahoma or
> reformat plans to their benefit yearly under Affordable Care, continuing
> to put the financial needs first and the needs of the patient under.

32. Further resolving as with **HAMMEL v STATE FARM** that the Western District Federal
   Court of The State of Oklahoma has jurisdiction in this matter:
   a.  The plaintiffs appropriate pleadings early tort claim findings and
   insurance mishandling with the City of Broken Arrow, Wagoner County,
   Cleveland County and Social Security State Led Hearing Court systems have
   shown manipulated, misled, obstructed, discriminative and unwelcomed in
   the State Courts of Oklahoma due to its complexity and threat to the State
   of Oklahoma's own misconduct and fears for liability. The politics
   surrounding Oklahoma doctors missing things have extended to Maryland,
   Missouri, Florida and at least Texas now in organized crime and predicate
   acts. As research has found created alternative facts, minimized findings,
   changed rules and obstructed justice causing other illness, damages and
   the development of untreated co-morbid chronic conditions to the
   plaintiffs may or may not further make the case unwelcome in the State
   Courts of Oklahoma due to the State's own conflicts of interest in the

original tortius actions and the organized crime that has been put upon the family.

b. The Oklahoma Department of Environmental Quality and the Oklahoma State Health Department both stated their jurisdiction in early exposure case proceedings regarding health was removed by the Governor of the State of Oklahoma, Mary Fallin was in office then and deferred to the Federal Environmental Protection Agency and our physicians, but treatment was not offered. The ODEQ lawyers have declined a desperate settlement offer from the family to help them afford travel to care out of state and a new owned home, but ODEQ defered again as recent as late 2015 to the Federal Environmental Protection Agency as the responding agency, who has failed to respond on behalf of the family and children's health even with contacts at the Centers for Disease Control and the Agency for Toxic Substance Disease Registry due to industry and energy concerns above health needs and general disbelief or denial of multiple experts and science. Jean Roupe of Fallin's office later stonewalled and scapegoated the family to keep them from getting needed help to diagnose their son's tumors instead of assist them as the family asked and proposed. Roupe was also shown to be a bad actor for baby Veronica Brown on behalf of the governor's office.

c. Treating physicians and health providers who have stood up in truth for the plaintiff family sharing the true seriousness of their health conditions: have been forced to retire early; had their care or the care of their family threatened or harmed; had their payments for care of the family taken back; or suffered other harms qualifying as organized crime under RICO.

d. RICO is most suitable to complexly cover predicate acts with wire and mail fraud of harassment or targeting the family as a workplace bullying victim in provider offices, meeting or treatment rooms to deny or hide collateral negligence or dupe the family making them seem unsuitable for care, school or agency services, at times falsely qualifying the family as the threatening one when speaking out in truth against false claims or injustice.

e. The criminal purpose of this complaint is to organize the evidence of patterns of wrongdoing from multiple culpable persons and ask the United States of America to intervene on behalf of the plaintiff family and its communities, even into the states, to stop the organized crime and illegal activities that have infiltrated legitimate government, school, medical and industrial businesses in addition to citizen lives under RICO laws which in turn is injuring good citizens and continues to pose a great looming and rolling threat to the American Economic System. Current tax status can no longer be a condition as working citizens have been wrongly left to suffer exposure effects without treatment, their tax status before illness cannot be denied, lost or falsified.

f. We ask for this in truth but without final devastation to the state of Oklahoma to allow other capable response organizations to organize growth, response and help finally in the public interest as to what is best for health and patients keep or return to their quality of life without issue or instead to remove an organization or agency from a response effort and

find a legitimate group that can affectively provide.

g. As medical and legal professionals have shared speculations about fossil fuels water contamination affecting the family, it is alarming to learn and find how state laws governing energy and utility policy exist. Insurance through a mutual or legal reserve engages in similar limits to the public even trying to force the plaintiff family directly to sign things supposedly in contract hidden as a part of the pay process, when there is no other insurer to choose from on the Healthcare Marketplace. Violations of the 1890 Sherman Antitrust Act sections 1 and 2 (15 USC § § 1-7) continue to occur to keep wind and solar companies out unless they join with current utility companies to limit fair competition, which is said by experts as continuing to interfere with options for clean water in at least Oklahoma as this plays a role in energy option fears, recontamination, hypersensitivity syndromes and continued toxic exposure with the family;

  i. Under case review of the plaintiff family's documents Summer of 2017, the public interest law school, reporting representatives with guidance from Senior Counsel stated, "you know the Trihalomethanes in your water are used to clean the hydraulic fracturing chemicals out of the water".

  ii. The group of legal counselors said they did see a State action over Toxic Exposure that is currently available with newer findings and the son's age of majority, this should be available to the plaintiff family under State law or district but has exhausted personal injury attorneys with license in Oklahoma to represent the family on contingency.

  iii. **Ladra v. New Dominion, LLC 2015 OK 53 Case No. 113396** and related Corporation Commission findings show more about Oklahoma water affected by oil and gas explorations in particular waste water injection it seems in earthquake damage proceedings. Discovery in those cases and preliminary hearings revealed the University of Oklahoma's misconduct of leaders and donors who may or may not have been aware of the industry problem, their widespread development to water contamination and later earthquakes that led to property damage.

  iv. The public interest law school case review group, recommended that the plaintiff family find out in the process of discovery with a legal action if the hydraulic fracturing company, the City water utility company or who used Trihalomethanes (the elevated Bromodichloromethane and Chloroform found in the family's home water line) to clean the water and left the chemical concentration at high levels. This has undeniable proof of the exposure and health consequences suffered by the family and are the causation they stated in a transcripted phone meeting.

  v. The City of Broken Arrow likely with help from the State has sought not to allow a path to justice in these areas in the past, averting or blocking due process, minimizing or obstructing justice. The first letter to the plaintiff family used language to the affect of "you cannot make me help you" illustrating their known and planned

abuses of power as government over the people instead of government representing the people who use due process and due diligence.

vi. A review of campaign contributors to State and City officials, District Attorneys and sometimes Judges can show the conflicts of interest from hydraulic fracturing and affiliated industry, insurance and professional healthcare insurance such as PLICO a MedPro Group / Berkshire Hathaway Company who is often required for representation of healthcare systems and physicians and their representing law firms that make the justice arena especially in Oklahoma an unfair arena full of interest conflict in the plaintiff family needs and case.   The plaintiff family must ask the Federal Court in assignment and after to remain mindful of **28 US Code § 455 (a-f)**.

vii. On behalf of the plaintiff family's own health needs and the health needs of their communities the family wishes to help itself and its communities with the use of supremacy clause known as the doctrine of pre-emption of article VI of the US Constitution to help wind and solar companies have access to free enterprise and stop other energy and health monopolies in the state of Oklahoma. The family has found this alone in Pro Se legal research. This article dictates that federal law is the "supreme law of the land". Article VI should additionally allow the plaintiff family to pursue RICO over the course of all organized crime that has happened to them from 1990 to present, and allow them immediate declaratory civil relief and criminal pursuit. The Supremacy Clause would pre-empt the conflicting state legislation especially in the cases of anti-trust and organized crime, as the Oklahoma Corporation Commission seems to allow.

viii. The Oklahoma Corporation Commission seems also to be removing Federal Trade Commission and Federal Communications Commission complaint processes, their jurisdiction and ability to take action when local utilities have played with the plaintiff family's base bill costs, taken deposits repeatedly and lost those payments failing to return them in likely effort to make the family falsely look financially unfit or risk losing access to utilities in retaliation for contamination findings that have led to other cases and proven community needs that the commission may be inept in providing. This especially and notably started happening with the family's utilities after reporting the gas leaks in their home to the Corporation Commission as they were told to. It may be some industry protection State law that is conflicting other state and federal agencies to include but not limited to Oklahoma Insurance Commission, Oklahoma Department of Human Services, Environmental Protection Agency, Centers for Disease Control, Agency for Toxic Substances and Disease, Department of Labor, Office of Civil Rights, etc complaint responses for the plaintiff family. Maybe such as state law examples as **Oklahoma Statutes Title 17 Section 151** which have been found were written to preserve oil and gas industries in Oklahoma and block wind and solar energy free

enterprise unless part of an established Oklahoma public utility per our ProSe understanding, it is also possible there is some citizen retaliatory clause that Oklahoma Keepers has not yet found in State law that allows such actions to happen to innocent families, possibly labeling them politically for their findings. RICO proceedings have a right under article VI to disclose why this has occurred and how federal RICO should instead recognize such happenings as organized crime that has caused injury and damages to the plaintiff family seeking care for the children, animals and themselves. The community and the economic structure of the state and maybe to other states have been disrupted by such misled actions that refuse to put health first.

ix. Predicate acts and decisions that continue to compromise citizens often in malice but at times in ignorance under the Safe Drinking Water Act and other Oklahoma Statute laws such as **27A OK Stat § § 27A 2-6-105 (2014)** simply do not allow pollution in the waters of the state. The disregard or minimum changes to look under these laws and others similar has remained often as unsolved problem under law. RICO proceedings might help shed light on how state laws that say there shall be no water pollution are able to be violated with other contradictory laws that in turn have harmed the general welfare;

x. Criminal RICO is additionally most suitable for the predicate acts due to the connected government abuses of power that have reached the plaintiff family's documentation, experience and documents that serve as proof in discovery of deliberate participation in adverse corrupt or collusive actions found thus far in timeline experience, recorded actions and document examinations of what happens when the State agency boss says no to public interest:

1. Mishandling of reports and complaints to the Oklahoma Governor's Office;
2. Mishandled medical need complaints with the Oklahoma Insurance Commission;
3. Ineffective complaint processes with the Oklahoma Nursing and Medical Boards, Joint Commission, Office of Civil Rights and Oklahoma and US Department of Health and Human Services that try to make ill patients do all the complaint work or mislead information;
4. Wage Case Mishandling of Stolen Wage and Paid Cobra Insurance Disruptions from the Oklahoma Department of Labor and its federal arm at the US Department of Labor that prevent justice even when ill patients provide proof;
5. Possible Federal Reserve interruptions in banking processes;
6. Dismissive and retaliatory actions in states of prolonged illness over utility billing and payment process problems, gas leaks findings and reports mishandling with Oklahoma Corporation Commission and the Federal Trade Commission, etc;

      7.  Social Service Needs Mishandling from the Oklahoma
Department of Human Services;

      8.  Health Response and Medically Necessary Health Needs
Mishandling from the Oklahoma State Health Department;

      9.  Mishandling of Toxic Exposure Health Response Requests with
the Oklahoma Attorney General's Office;

     10.  Written Errors in Toxic Exposure Records from the Oklahoma
Department of Environmental Quality and Response with the
Environmental Protection Agency;

     11.  Misleading Audit and Payments Mishandling from the Internal
Revenue Services that the State of Oklahoma IRS offices or
their referred tax payer services would not assist to
remedy;

     12.  Lost Payment Records, lost Medical Records, Delays and
Denials of Hearings or Falsely Fluctuating Type of
Qualifying Assistance and parental relationship as examples
from Social Security;

     13.  And More.

    xi.  Violations of or misuse of ERISA and the Affordable Care Act remain
problems that can be addressed wholly and fully under RICO in
discovery and do not conflict with those areas of law to the
knowledge of the plaintiff family;

    xii.  Findings of malice with malpractice, planned and deliberate actions
to neglect children in care causing collateral harm against are not
just violations of state and federal laws but international law and
human rights but can be addressed wholly and fully under RICO;

   xiii.  RICO it is not just civil in the plaintiff family case because
there is Bodily Harm and Intent to (Medically) Kidnap. This
additionally includes patterns and multiple incidences of mail
fraud and/or wire fraud. To acknowledge the criminal seriousness of
the information this action brings and in light of deaths that have
occurred if knowingly allowed to continue with science denied, **18
U.S.C. § 1091 (a–e 1)** law comes into play but is out of character
for the United States of America as many flee to America because of
such injustices in other countries.

h.  There is not a Diversity of State Citizenship with the plaintiffs at the
time like **HAMMEL v STATE FARM filing, 28 USC Sec. 1332** regarding the
tortious actions alleged and violations of but only because the plaintiff
family to include the children have refused to be pushed out of their
state and fought against it. There has been and is a forced diversity of
State services in order to sustain life, the family hopes to resolve in
this action.

i.  Since 2010–2011 it has seemed the insurer or the State and some hospitals
have tried to push the family out of state. There are other families who
confess predicate acts ran them out of the state but they are heartbroken
and still have to come back to tend to family, as the plaintiff family,
which proves fleeing their home state of citizenship was not a complete
answer in those attached to their families and communities with a good
support system. It is already proven with changes in state that it is not

often ideal for family support to live just two hours away. The family is not opposed to creating multiple residences and a travel fund with relief to help them be near family but have a safe residence when travel for higher level care if it continues not to be available in Oklahoma.

j. **18 USC 1962-1968 (RICO), and 18 USC 1951 (Hobbs)** by Insurer Defendants who do show diversity of citizenship in multiple states across kinship companies, as termed by managers in the Health Insurance Marketplace, to include but not limited to Illinois, Texas and Kentucky in addition to the states where care was referred for the plaintiff family, usually the children from 2005-2017 since continuity of these actions spans during that time thus far. Plaintiffs' allegations are against multiple culpable persons directly and indirectly to include but not limited to State Farm Indemnity, a wholly owned subsidiary of State Farm Mutual, and therefore also against State Farm Mutual which does business in many States of the United States; the home offices of State Farm Mutual are in the State of Illinois, of which it is a citizen, while State Farm Indemnity, upon information, belief and reasonable investigation is licensed in the State of Oklahoma, and the State of Illinois to do business within those States, and that it does business within the State of Oklahoma. The Parent company, State Farm Mutual does business in the State of Oklahoma. On information and belief, State Farm Mutual is a Foreign Corporation doing business in the State Of Oklahoma. There are similar legal reserve and mutual reserve relationship layers created for Blue Cross and Blue Shield (Health Care Service Corporation with the Superintendent of Insurance) and United Healthcare that assist them in doing business with layers of protection in the State of Oklahoma and other states. All should be found in discovery and face a role as the defendants.

**Older Blue Cross Policies Include:**
   i. YUP832510688
   **Past UnitedHealthcare Plan Number:**
   ii. 0904962
   **Community Care of Oklahoma Policy Numbers:**
   iii. C00188573
   iv. C00000318

k. Like the plaintiffs, Community Care of Oklahoma resides as a citizen in Oklahoma but does business through a parent name in other states as the policy identification card transferred to when the plaintiff family was receiving services from Texas Childrens' Immunology in Houston, Texas 2010-2014. Community Care, it's case management department and the medical director remain key defendants who started the organized crime in the children's health making it's legal reserve companies, attorneys and agents a part of the RICO discovery and also named as a defendant. There should be subpoenas of ALL documents in employment with the mother and father's sign up with employers. There are specific possible bad acting documents created in these files to be shared in discovery under legal protections for the plaintiff family.

l. The plaintiff family elected health insurance since first available to them in employment as a married couple 1993-1994 and never had a true gap with many certificates of insurance over changing jobs that moved their

careers upward until a forced small gap at the end of 2015. Even through extensive health expenses that exhausted their savings, retirement funds they always found a way to keep paying their premiums and find a way to afford their yearly co-payment and out of pocket max after 2005 when exposure and illness began to strike.

m. Other multiple culpable persons to be found as bad actors under RICO committing predicate acts are found in multiple states through the defendants "ways of doing business" and the family's continued treatment as patient dumping as they continue conquest to get injuries and medical needs met, always medically necessary.

n. Based on the preceding, the allegations contained herein constitute a matter which affects Interstate Commerce, and presents a condition of "complete diversity of citizenship" with proof on continuity in policy and paid customer relationship with the companies; the matter, therefore, falls within Federal Jurisdiction, and specifically again under **18 USC 1951(b)(3)** of the Hobbs Act.

33. Furthermore, the purpose of Federal Rules and Civil Procedure seems to not waste the time and resources of the federal court. The two separate legal actions proposed for **One: immediate injunctive and declaratory civil relief; and Two: to start criminal RICO process as listed in this complaint** most efficiently solve the problems that have been occurring and that have become important nationally. These actions provide a means to solve all of the following.

a. The problematic need for plaintiff legal counsel is resolved with the court if actions are accepted.

b. The well-known ability for the defendants to bury plaintiffs and the courts in processes and litigation, false, harassing, excessive supposed errors or delaying actions are resolved.

c. In this current year of 2017 the President of the United States has ordered its agencies to "drain the swamp" which should mean to get rid of those employed who are engaging in corruption, while removing Terry Cline from the Oklahoma State Health Department possibly helps that, the plaintiff family does not see how moving the financial officer who is concerned with finances over health into a position of health. These proceedings would serve as a means to fulfill his order no matter the known or unknown intention. Providing more accurate accounts on the criminal side of how such corruption occurs and continues to injure even the children of Oklahomans and Americans could be helpful federally in its decisions to make changes and assist Americans to rightfully repair government, industry, health care and more.

34. PLAINTIFFS' AVERMENT REGARDING RULE 11, FRCP

a. Further extant evidence and argumentation, elucidating the pattern of racketeering activity, and information which will be acquired in the process of discovery, will establish the necessary preponderance of evidence as is required by the Court in accordance with the Federal Rules of Civil Procedure.

b. In particular, with regard to Rule 11 of FRCP, Plaintiffs aver that all statements and allegations are true upon information, belief, and reasonable investigation, and further that this action is not brought with any purpose to harass or defame Defendants, and further that it is not of

any nature that could be called frivolous.

    c.  As possible and with care to avoid libel, plaintiffs have, in good faith, attempted to balance the necessary requirements of specificity and particularity pre-discovery, under Rule 9(f) of FRCP to establish sufficiency of this pleading, with the requirements of concision and directness under Rule 8(e) of FRCP, all in accordance with Rule 11 of FRCP.

35. The Amendment V of the US Constitution says to the federal government that no one shall be deprived of life, liberty or property without due process of law. The same eleven words are also used as a Due Process Clause in Amendment XIV of the US Constitution, the plaintiff family continues to feel the denial of due process with limited understanding of how the chemicals came to exactly get into the family's water at elevated levels causing bodily injury and damages especially to their growing children. The family needs answers as to why predicate acts to follow were allowed to steal their healthy life, continuity of care and predetermined health needs to include property also without due process of law. Additionally enduring blocked access to specialty care and required life saving medications and monitoring for the diagnoses of Primary Immune Deficiency, Asthma, Infections and Autoimmune Disease, Tumors, Cysts and Cancers deprives the plaintiff family of life and liberties that other patients have with other similar life threatening diseases indiscriminative under State law as well.

36. For necessity, it was finally decided to work around multiple family illness episodes to make this action happen and finish writing when the youngest child remained in dire need of specialty care as more than four treating hospital physicians urged the family is true and provided tests to show her dire need but left the mother with the charge of finding specialty care to take the child under political fears and problems. The previous information should explain the need to move to ProSe and how the family agrees it is not ideal and does not want to be assumed a fool or in control. The mother has previous college classes on tribal law and journalism law and participated in mock trials for business law basics in high school which does not qualify her for a Federal case but she is willing to help the plaintiff family embark as her health allows for their needs, survival and right to damages. Malpractice and personal injury are most often taken on contingency in the working class but those have not been available options at an effective level to get their problems resolved, as learned in consults or short representations with attorneys. Overall this ProSe status further relieves the stress of licensed Oklahoma legal council who have openly shared and admitted upon multiple consults with multiple culpable persons retained or unretained through the years.

These are some but not all of their actual statements made in consult with legal associates:

    a.  This is a matter for the authorities.

    b.  What is happening to your sweet family is injustice, you have legal problems and social problems but I am near retirement and cannot take on such a case.

    c.  Your son is currently in the legal age of majority window for past toxic exposure claim you should try again before that statute of limitations is up;

    d.  I just don't have the resources to take your case.

e. What is happening to your family is just criminal, I wish I could help you and I do not know anyone in that area of law, maybe try calling the local Barr Association or attorneys who provide criminal defense because they know criminal law and I am a civil attorney.

f. The Oklahoma City Barr Association said "we cannot give you a referral" only help you report those that have taken money from you.

g. I can only take your case with a public interest law school and major University behind you.

h. I just do not have the resources to take on the army of the defendants you would have against you in a legal action.

i. You are good and kind people; that is why I cannot negotiate with the powers that be for you.

j. Read the book A Civil Action about Woburn to see what happened to Jan Schlichtmann and you will understand why I cannot take your case.

k. I cannot risk my own healthcare or the health of my family in retaliation for continuing to help you.

l. You must pay me at least $10,000 to cover my upfront expenses to find an expert. (Another requested $3,000 and seemed to understand how life threatening it was to take away the IG therapy from the children, but never made any follow up for the first $400 that the plaintiff family raised from friends.)

m. You had a toxic exposure without a doubt, there was exposure, and there are illnesses that match the known data on the exposure. What happened to you is protected Federally under the Safe Drinking Water Act which our law school sues the government for all of the time however your city made corrective actions and although you have proven those are not or will not do the job, keep trying to find a lawyer to help you in the Oklahoma courts you can get all of your damages, ask for medical monitoring and more under Toxic Exposure. We are not going to be able to represent you. I am very sorry.

n. RICO is the action you need to take and I will tell you why, it is based most upon what is happening to your family day to day, it has interfered with your wages and right to make a living but it is something few lawyers work on nationally and I don't know who can effectively help you with that but I will give you the name of someone who might. (of course he could not take our case)

o. I sue the government all of the time. I recently won an action with the State of Oklahoma; they did not pay. I had them served to pay, but they still did not. I took them back to court and they still did not pay. I could win relief for you in the State courts but no one in Oklahoma will make them pay and you need help, not a victory that cannot bring relief.

**IV** Other Issue Important Facts:

37. The family did not knowingly or willfully cause any of the injury or collateral injury on their own;

38. Without a doubt, the water in the family's owned Broken Arrow, Oklahoma home under purchase was dangerously contaminated and there were an unusual amount of gas leaks and plumbing problems discovered;

39. The problems with the water in the area were known by officials and leaders before the plaintiff family findings but not disclosed to the public. There was a back

flow problem at move in during 2001 that the City knew was evident and sure to happen, they were watching for it without reveal to homeowners;

40. There is an ongoing problem with water back flow in the home's area, that continues to be a complained about problem with the City's residents as noted about law suit plans for torts denied in the Broken Arrow Ledger newspaper archives as late as 2016, even post new water plant it seems. Torts continue to be denied by the City without damages reimbursed except by insurance when applicable;

41. It is resolved; the problem causing health injury to Oklahoma Keepers and their communities was not the fault of the homebuilder or developer. There were flaws with inspection and code gas piping used found in City records during a time of exploding housing starts in Broken Arrow, but it has been determined thus far the problem was the larger stress on the system and widespread instead of a narrowed problem in a certain area or with the certain home;

42. The master planned community in Broken Arrow where the family purchased their second larger home, after selling their first in Tulsa, seemed created safely by the developer, looked healthy and of a highest standard as compared to both new and old developments in the surrounding neighborhood areas and other Tulsa suburbs.  There were no known alerts to health, water or air quality concerns that the plaintiff family was disclosed or made aware of. It seemed like an exceptionally clean and safe place to invest in a second larger home; to support their children's healthy and active lifestyle; to raise growing children with neighborhood play and amenities; camaraderie and support as the mother and father were raised;

43. The family is authentic, logical thinking and has always been self-sufficient and never been attention seeking. Their extended families do not have a history of any known long-term poverty resource use or needs prior to this exposure.

44. There is proof the plaintiff family was poisoned by contamination and has received toxic exposure with abnormal chemical levels documented by more than one source;

45. Private experts found the exposure and the State of Oklahoma confirmed it;

46. The water contaminants were determined by the Oklahoma Department of Environmental Quality to be coming from the City line and not a well or the home itself. There were other contaminants known in the area that the DEQ preferred not to disclose;

47. Experts told the plaintiffs toxic exposure from chemicals in the City water reaching the plaintiff family's home from 2001-2012 was the causation for the family, pets and children's recurring cycles of illness not resolving;

48. There were additional toxins found in the area with other illness clusters, and at the Norman sites the family later moved to but the State and Insurer did not fully disclose or additionally test for those and left the family on less than a casual need to know basis. Their additional exposure accumulation is not yet known;

49. The tests and problems developing were expensive to remedy and becoming more widespread, relating to State business needs, so the City continued to battle the growing complaints behind closed doors in denial and fear it seemed that led to malicious acts of denial;

50. The family's home in the neighborhood was at a low lying part of the water line, so they received more accumulation than others in the neighborhood, but others were also effected;

51. The son, who had been the healthiest in the family, was given a prognosis without a clear reason before even the multiple gas leaks were revealed prior to water findings. His pituitary, liver and salivary duct tumors were not and remain today

years later with symptoms not followed, biopsied, diagnosed or treated per the standard of care others received in Oklahoma communities but recurrently left the son plaintiff with findings lost, shortly monitored, delayed and denied;

52. With first gas findings, out of state medical experts suspected shale gas problems but the family was unaware of such explanations or possible area industry problems. They were not knowledgeable about environmental problems occurring or looming.  The family was advised to get their children out of the home for a trial period and then possibly for good as it would likely have a sick building syndrome for many years to come;

53. After confirming medical expert fears, a second home they bought in Broken Arrow was outdated and smaller but the mother saw it's potential if they could all recover and work again, paying to build on a master suite in the future. The thinking was go back to the era home we came from and maybe we would be better, this one was nice affordable, with land and still close for the oldest to graduate from high school;

54. However unknowingly, it was also contaminated. Due to so much ongoing health cost and loss the family could not afford similar environmental tests as the Insurer and State provided at the first Broken Arrow home. It seemed reasonable as the family bought the home based on the rural water line instead of the City and no natural gas service on the property, which made affordable general plumbing inspections during the escrow period seem to be enough. But the results of those inspections ended up being false and the home was on the same contaminated City waterline after all. After move in, as the shower started leaking and the toilets stopped flushing the family found most all of the cast iron pipes were deteriorated. Additionally hidden mold was later found in the walls at the time of pipe removal;

55. Although multiple family members remained sick, the family worked hard for their second BA home repair while juggling illness and being moved out of their home again without the mother's job, and school services cut to the son for a prognosis and the youngest daughter changed to homebound.  The family fought with contractors and the insurer to make the smaller house livable again with replacement pipes, but they were still having illness and symptoms. Their son was still severely suffering and non functioning but the family had worked with doctors to find a series of tumors he was suffering from maybe age 10-11 to now age 13-14;

56. As the family was finding their situation inescapable with new and recurring health problems continuing in all family members and their pets, their continuity of care doctors; patient dumped the family with corruptions looming and affecting their nurse and doctor's own family care in some cases. There was also discomfort in providing care because the physicians did not have response information and know what to do. As their son was given a prognosis, the family was told they should move. Access to needed highest level specialty care became blocked and then two of their children became too ill to be at school as the insurance stole access to the IG therapy medication and the Oklahoma Insurance Commission failed to act when a complaint was made, leaving the insurer to audit themselves over the problem;

57. Extreme elevations in predicate acts began occurring in 2013-2014. Bad actors brought in new school administration causing conflict with the family and their doctors behind the scenes while the son was barely ambulatory and the mother had

spells of debilitation from untreated thyroid cancer and a growing heart condition. Costs for insurance and medication became prohibitive without the mother's income, to the extent the self-sufficient family had to borrow money from family to pay insurance premiums. So after deliberations and more trial and error with the insurance carrier through the employer and his agent that was later found to be a campaign manager for a Congressmen, the plaintiff father less symptomatic at the time, took a job offered in Norman, Oklahoma and moved the family after the oldest graduated from high school;

More information has surfaced in Corporation Commission guarded proceedings and Cleveland County Court settlements with Prague Oklahoma earthquake cases that include evidence of water contamination in Oklahoma and its relation to industry. This helps to confirm findings of the plaintiff family are not far fetched; and how there is evidence of industry guarding;

58. The response new water plant was not designed, to the family's knowledge and review, to effectively deal with such problems;

59. Infrastructure replacement in the immediate area does not resolve infrastructure problems in the delivery system;

60. Health problems caused by elevated contaminants do not get better or go away, they are shown by medical and legal experts who have studied the chemical and affects to be lifelong staying in the body's tissues or remaining as end organ or tissue damage, combining sensitively with new exposures;

61. The City of Broken Arrow its agents, municipality and legal protection groups purchased the water from the Oklahoma Ordnance Works Authority and admitted they knowingly and deliberately brought the water through broken infrastructure in the delivery system loosing thousands of gallons out so it logically means those holes for the loss could easily become holes for leaching in. This was with hydraulic fracturing sites and other oil and gas drilling sites located between Pryor and Broken Arrow. OOWA has its own military production history in World War II and is south of a well known Tar Creek Superfund site area only recently disclosed as a concern for groundwater with runoff from the area; and

62. Discovery is and was needed to know how the chemicals and the broken delivery system interacted to bring the elevated chemicals to the Tulsa suburb of Broken Arrow or if a hydraulic fracturing testing site in the area of the plaintiff home, leached from the testing pond but due process has been denied through Tort filing and ineffective environmental law council. There are many questions that have remained unanswered as to how the plaintiff family became toxically exposed, that should have been resolved by the State authorities at the time of finding the elevated chemicals levels but continue to appear corruptly avoided.

<u>**V.** Prior To/Back-story With More On True Character:</u>

63. The plaintiff family to include the children were and still are good people who followed the rules and did most everything right, but not in a way of mongering the rules in a social and fun way, very accepted in friendship circles.

64. All family members have an exceptional work ethic and finish most jobs they begin prior to but maybe now slower with illness, even when transitioning or leaving a position, they make sure their ends are tied up.

65. The Tulsa native plaintiff father and mother met in middle school and went to high school together. They were friends through classes together and event circles at school but did not date until the mother was in college.

66. The plaintiff father's mother was a Tulsa native and his father was a Poteau native the two met at a restaurant in Tulsa. His Tulsa grandparents on his mother's side died early in life one after the other, he was too young to remember much about them. But he visited the grandmother that raised his father a few times of the year for a country experience to understand the difference and develop an appreciation for his father's roots. His mother was a Registered Nurse and his father was a Salesman in the Grocery Business who later settled into Mobile Home sales. The plaintiff father had grown up in Tulsa in a Boy Scout troop, well-rounded and active in sports as his main hobby with neighbors and swimming in his neighborhood pool across the street. He went to Mayo Elementary, Skelly Middle School and Nathan Hale High School Tulsa Public Schools. He was always social, well behaved and involved at school, with very strong skills in soccer and baseball. He played on the high school baseball team and stayed in recreational sports even into adulthood.

67. The plaintiff mother grew up connected strongly to nature, gardening, swimming, Oklahoma lakes, grandparents from Oklahoma City on one side and Iowa transplants to Tulsa on the other side. The family was continually social with extended family, cousins, neighbors and friends of the parents. Her mother graduated from High School in Oklahoma City and father from Tulsa. The two met at the University of Central Oklahoma before her father was sent to the Vietnam War conflict enlisting just prior to the draft scared but at his military father's advice. The plaintiff mother attended Hoover Elementary, Whitney Middle School and Nathan Hale High School. She was a campfire girl until high school, played violin at school and in a youth symphony for a time, she played softball, flag football and volleyball with friends for fun and cheered on the pom squad for elementary and middle school football and basketball teams. She was in a community performance dance group for 14 years performing tap, jazz and ballet at Tulsa events, and learned racquetball and modern dance while she pursued her degree in college.

68. The father's first job was at a local grocery store as he prepared to pay for his own responsibilities in driving, later he learned retail skills in DECA classes at school and followed friends to a local retail furniture business that was thriving. He chose to become a skilled warehouse laborer in order to work his way up and decided to stop attending community college classes about age 19 to focus on building skills at work and starting his own venture creating wealth working, purchasing the clothes he wanted, buying a home, the car he wanted, etc. He had plans to buy a home for himself before dating the mother.

69. The mother's first job was at a Toy Store with a work permit still at age 15 also preparing to pay for the responsibilities of driving and outings with friends. Then in Cooperative Office Education in High School she went to work for the domestic travel side of AAA where she prepared driving maps and learned to talk to customers about their travel plans, how to find different rates and make hotel and car reservations.  In college at OU she focused on her studies but returned to AAA one summer and interned or shadowed at KMOD radio, the Associated Press and the Oklahoma Department of Transportation and found fill in hours with her sister at the movie theater close to her Tulsa family home. Due to the stresses the Vietnam War put on her parents during college, she became the first in her immediate family to finish college, she was active on student congress at OU and in Delta Gamma sorority where she was also the first to join.

70. The father's artistic skills and creative eye brought him into the buying side of

the business later. After attending a high school holiday party, he started short
distance dating the mother from Tulsa to Norman as she was finishing up college
and began to pursue her through his childhood neighbor who had been the plaintiff
mother's room mate in college and they remained friends and would get together for
social occasions. As the mother graduated from college he knew she was the one, so
he asked her to marry him. All he knew was hard work; he was focused and
responsible, known in high school circles as a sweet person, funny, active and
caring for others, helping clean up after events, etc. He mowed yards and later
washed cars in the evenings after work with his wife to be, in order to save down
payment money for their first home they purchased just before marriage, in the
mother's childhood Tulsa neighborhood where he had often enjoyed visiting friends
and found the first time home buying options to be affordable. After a few years
of marriage, the couple started making plans for a boat, pets and eventually for
children so he decided to move into sales and quickly became a top salesman. High
school friends who were also thriving in the car business recruited him away from
furniture. The mandatory Sunday's off by law in the car business was the point
that finally got him to leave furniture.

71. The mother worked for her aunt and uncle's Oklahoma City based computer
maintenance company putting her college skills to work for internship hours both
in Oklahoma City and Tulsa her senior year of college then she went to work for
the American Lung Association (ALA) when she returned home to live in Tulsa after
graduation. There she created a marketing position putting her skills from college
in public relations and journalism to work to help the organization promote its
health information and fundraising events and campaigns. The mother had always
been about best odds, during pregnancy she would not even have a sip of wine, put
chlorine in the pool or change the cat box as an example.  Not because she was
educated on the environment but because she followed her allergists rules to try
not to turn on bad genes or exposures and she read it in pregnancy books about
what to expect for best odds for a healthy child. She also worked for the ALA then
and was educating the public and doing talks in schools about the hazards of
smoking and was a Certified Open Airways Trainer, who taught school nurses about
the severity of Asthma when symptoms were apparent or not apparent. After a child
died from unrecognized Asthma in Tulsa public schools, the plaintiff mother led a
media response and relations campaign about Asthma, she assisted the program
director in wide spread trainings about how to better recognize the symptoms, how
not to make wrong assumptions and why, with a visual program used to teach the
nurses and health clerks in schools.

72. The plaintiff mother additionally worked at Service Merchandise in the jewelry
department as a diamond certified specialist during the holiday season because her
husband was also working evenings in retail and both families enjoyed the extra
funds to make a to do over the holidays celebrating life. A public relations
opportunity more focused on media relations came up so the plaintiff mother moved
to the Home Builders Association although she was 8 months pregnant with their
first child and the extra income with the job change allowed her to stop returning
to Service Merchandise for the holiday work.

73. The couple held almost weekly swim parties for Sunday dinners in their backyard
pool during the warmer months because the plaintiff family could not wait for
Christmas to be the next get together. Getting the young cousins together was a
family priority. Over the years the plaintiff father moved up and up in the

automotive industry and the plaintiff mother worked in homebuilding increasing the
public interest information side of home buying and remodeling needs. The
plaintiff father excelled and was respected by his automotive peers and a customer
following some back from his furniture days for his positive attitude, fun, strong
will, work ethic, and love for his family.

74. The plaintiff mother grew professionally in the community through work experience,
improvements in technology and organizations such as PRSA, the Tulsa Press Club
and the Association for Women In Communications. After the birth of their second
child, she began to consider creating a niche business on media relations she
accomplished this to juggle time with her children and be more available in their
lives as her mother had vs. hire evening help to meet the growth needs her work
was creating with other leadership relationships. Balance became important to her
as she transitioned her children from a home care environment to a school focused
on learning by doing at an early age.

75. While the couple remained present and active in their children's lives the father
grew into different management areas of the automotive business and the mother
grew to various projects with two other women in freelance business creating
results for many Tulsa businesses, her results proved in the Tulsa community she
was a trusted ethical journalist who knew how to organize information for the
public interest. She was recognized by her peers for her ability to organize
information to solve problems and create growth. She was asked by the Tulsa World
to move the World of Homes from a news to an advertising product to meet the
advertising needs of the local homebuilding industry. Many of the elements she
reorganized in the publication are still used today. While continuing to raise
their children and expose them to daily learning and culture, her husband's
success and her own resourcefulness allowed her to take over projects still
unfinished from local growing museums and non profits that in some instances the
leadership had already paid a local agency tens of thousands for an incomplete
project or plan. She would take then on for a lower hourly rate as she could and
more projects were often brought to her for her accomplishments with them and
knack for media relations because she organized the projects for ease of media
use. She was asked to be a board member often for her professional contributions
and she accepted on some occasions where she knew her work was passionate and
could be juggled around her health needs, participation in her neighborhood,
school and community and the needs of her children until illness started setting
in her oldest daughter and that brought change to what she could have time to do
for others and eventually brought physical change to herself, her abilities to
function without needing to rest, lay down and handle events and even to write
press releases.

76. The plaintiff mother's family did not keep soda pop or boxed foods 80-90 percent
of meals were cooked at home from garden; farm and store bought fresh food. The
mother had to enjoy soda out or on special occasions.  Boxed foods were generally
not kept; macaroni was made with noodles and shredded cheese vs. a package except
on rare occasions. The plaintiff mother fed her family the same but likely ate out
more during times of work events that took her energy and time away from meal
planning and preparations.

77. When the family went out they drank water or milk to support the father in his
weight needs and had no desire for the sugar sweetness of soda pop except on
special occasions. This was by their own right and decision not because someone

ridiculed them; the father was the only one struggling with weight during this time.

78. The father and his brother were charged with making sure the house was clean and helping to prepare fixings, chop vegetables, etc. for dinner for easy cooking when their mother came home from work to sit down to a family dinner.  The plaintiff father carried these types of assistive skills to his family and many women in their family and communities were jealous of his willingness and inherent skills in homemaking that helped the dual earner family remain functionally even during times of more mild illness. As illness became more severe neighbors and extended family would assist and step in to keep the healthy flow of the household.

79. There were no cannot have rules or you must eat it before you leave the table because the plaintiff mother and father had seen how those parenting actions are not supportive and can become abusive, they remembered the defiance it brought with their siblings hiding food in a plant or napkin just so that they could leave their table. The plaintiff family enjoyed their end of day gatherings and would follow them with social time, learning or a game they strived to always make their table a place of gathering, for their extended family, children and neighbors who came over to eat, as much as possible.  Although there were times they tried suggestions from others to be sure they were doing all they could especially when it was not understood their daughter was struggling to eat because she had an infection her physicians were failing to find.

80. The children, neighbors and parents swam in the pool almost daily at the Broken Arrow home during the warm months;

81. The children were already athletic, social and in team sports, when the family moved from their Tulsa home in ownership to their Broken Arrow larger home in ownership with their best friend's children as neighbors, sidewalks, fishing ponds and parks to use and easily appreciate the outdoors;

82. The plaintiff mother juggled her work schedule and took the children and neighborhood children fishing, biking

83. The adults and children were well known to be practicing clean eating and abundant exercise, biking, swimming, multiple sports and more daily.

84. Their metabolism was good, as their bodies required snacks through the day and not just breakfast lunch and dinner. The mother and children had no issue with weight and no life history of problems with overweight or obesity. They had muscle tone and a normal BMI.

85. The mother took time to exercise or walk with neighbors or school parent friends, purchased her own season tickets and would take the kids to Saturday OU games by herself. She visited her twin sisters, which were new mom's living in other parts of Oklahoma at the time, since her husband, previous to illness she would pick up the kids and go without hesitation.

86. The father played sports with the kids in the driveway and eventually was recruited to coach the son's little league teams as the fathers got to know him. The mother helped organize the baseball team logistics he was in charge of with support from other great families who grew to be a family and support them through their children's changes and illness that they saw happen first hand.

87. The children were not abused in any way by the family or neighbors, pushed to be sure they were not lazy when their medical needs were not yet understood as any responsible parent listening to misunderstanding from some doctors but not all. There were times as they got sicker when family members had unsolicited parenting

advice and assumptions of behaviors that were found to be misunderstood but the family overcame these problems with health answers and most all came to learn and were saddened to know the childhoods they experienced were stolen from the children due to lack of addressing medically necessary problems.

88. The painful tests doctors wanted that were hard on the children were just as hard or harder, at times unbearable, for the parents.

89. Neighbors confessed later they moved to the area because they saw the plaintiff children playing in their driveway with neighbors, playing football, basketball, t-ball, riding bikes with parental monitoring from a young age.

90. The parents remained connected to childhood friends chairing reunions attending events at friend's homes, etc.

91. Had lake house and boat for a change.

**VI. Effects:**

92. The City of Broken Arrow did not disclose their knowledge of contaminants and unknowingly the chemicals accumulated in the two oldest children, beginning at 4 and 5 years old;

93. The family health findings at exposure matched material safety data sheets on the chemicals isolated by experts;

94. The toxins accumulated quickly in the oldest child, she was the first to evidently show physical changes with muscle loss and prolonged chronic illness that could not get better;

95. The son especially was sent to multiple sports with jugs of City of Broken Arrow water, and would have symptoms that were later understood as detoxing that was found by experts resulted in organ damage and disease from cumulative re-exposure;

96. The youngest child was carried in-utero living in the home with no knowledge of water concerns and was born struggling to breathe, although the mother was extremely fit, exercised and ate exceptionally well through pregnancy;

97. Had to sell the lake house and boat;

98. Almost no vacations that did not include medical visits since approximately 2005;

99. Experts and primary sources of medical research show where years of toxin exposure cumulate in the body, organs and tissues and cannot just detoxify and leave in humans and mice;

100.      Repeated exposure unknown in the same community and then in other communities with similar uncared for concerns causes more accumulation, has proven to cause disruptions in the body's internal systems, damage to multiple organ systems, to include but not limited to autonomic dysfunction and disease;

101.      Due to the known cancer causing nature of the chemicals identified in the water system that entered the home, experts have shown and explained where cancer has been caused or is a risk to turn into benign cysts and tumors and will continue through life to be a risk in addition to other cellular, organ changes, DNA and chromosomal damages that continue to show additional problems, symptoms, and disease to monitor, treat and balance in all plaintiff family members.;

102.      The children and family are sicker than they ever were before the exposure with more systems effected, even if recurring in cycles;

103.      The people were not just sick but the animals too so the later IG therapy cannot be to blame as high risk medication use, as the dog suffered repeated infections too and the family was asked to test it for immune deficiency although the substitute vet at that visit should not have known about the family's newly diagnosed condition.

104.        The hamster only shared air and water with the family and he grew large
tumors when the family left the exposure. A thymus cancer tumor killed him as the
oldest daughter decided to use her 16th birthday money for a vet consultation and
autopsy after he died from not being able to breathe due to the tumor. The small
animal vet did not believe this was in any way characteristic for the animal and
beyond what she had seen in other hamsters giving her medical opinion this must be
the chemical exposure but the autopsy doctor was too scared to make such a
proclamation in writing on the report.

105.        The family had to give up their 20 year home equity, mortgage and good
credit status to find safety for their children because home insurance that used
their environmental rider paid on the policy to put them in a hotel, test and then
dumped the family with findings that were under the City of Broken Arrow's
jurisdiction.

106.        Third party impartial environmental health experts, to include a physician
appointed by Regional Poison Control and not the family or any known friend,
linked severe and adverse health occurring in healthy children, adults and animals
to contaminated water in the home.

107.        As the State responders, insurers and their leaders placed themselves in
bureaucratic positions to block the plaintiff family's health care wrongfully
anticipated the family would learn to live with the level of injury or silently
suffering in home symptom treatment and perseverance until death it seems. The bad
actors continued steps further wasting valuable state resources to silently turn
the family's perseverance looking for a doctor who would agree to help ethically
into something falsely sinister such as hypochondriac behavior, etc. creating
alternate facts from the plaintiffs own paved road to survive. The patient
continued to be dumped under false pretenses in order to help bad actors create "a
record" which in itself is a violation of Federal Rules of Civil Procedure
misleading and twisting papers and circumstances per the plaintiff family's ProSe
understanding in Rules 8-11 as this area of law indication has proved harder.
These violations can be held applicable under FRCP as they were misled and twisted
by defendants in Social Security hearing proceedings.

108.        The public interest with known exposures and industry problems in the area
and across the state continue to be either minimized or denied, especially in the
interests of health.

109.        Minimizations by the state and insurer and not the patient's own doctors
about their true health conditions surround the family now in malice in
retaliation for finding truth, with their access to care and therapies remaining
blocked with continued reactions damage and possibly re-exposure;

110.        The citizen family continues in suffrage with damages and needs
unaddressed or barely addressed problems reviewed.

111.        There is excessive collateral injury to the plaintiff family and their
communities from disregard, disbelief, conflicts of business interest, malicious
decisions and fraud which resulted in failures of duty to act and abuses of power
not in the public interest;

112.        The neighbors have excessive illness too, children and adults, some in
clusters. There have been abnormal clusters of death in 35-52 year olds in the
direct contaminated area;

113.        The plaintiff family alleges, Oklahoma business and political leaders who
decide the type of response when a toxic exposure is found, chose to focus on

their beliefs and fears against scientific proof and public interest. But further decided to punish the plaintiff family for finding why their three healthy children kept experiencing severe and recurring illness, now suffering RICO predicate acts additionally.

114.     It is a sad day when a family must put their private health information on trial and the specialty medically necessary advice, treatment and care they need remains stolen without legal action.

115.     It's not like it is over and we just cannot get on with our existence, our youngest just had a life threatening bout in Sept. 2017 after her care and medications were taken again in May.

116.     Over time, the planned deliberate deprivations to those exposed to the toxic water without due process have become more and more apparently criminal. With elements and predicate acts that sought to:

    a. Limit response or block jurisdiction from local, state and federal government agencies and courts;

    b. Curb due process of law;

    c. Deny the serious and necessary reports from inside agency or outside public expert and scientist expert input although well correlated with findings;

    d. Persuade decision making, allow lack of transparency and refuse or curve right to know;

    e. Fraudulently create alternate facts beyond error meant to change the narrative, defame or smear the plaintiff family collectively or individually;

117.     Other patients likely injured by toxic exposure at least in the State also endure falsehoods or blame for health conditions as behaviors instead with unknown and known exposures;

118.     Manipulations of right to continue care with disabling childhood conditions, steering children wrong away from their progress with family and providers, using false conditions to block parents from records of their still minor children. Conditioning college age students still dependent on family to make decisions contrary to records and findings for care to mislead the student that their previous parents and providers were wrong.

119.     This is beyond a poverty issue, or a lack of insurance issue, rights issues it is simply corruption at corporate mafia type level that is killing the family and their communities, it began when the family was making an ample wage and paying for two high cost private insurance policies under the father and mother's employers, long before the systems knew of the exposures and yet allowed the family to continue to be harmed and planned a racketeering venture to block the family from both care and justice no matter if it was in disbelief, ignorance or maliciousness it was nonetheless organized crime.

120.     The minor child, age 11, is physically sick in dire need of appropriate specialty care and currently not followed properly but has three specialty hospitals across the country willing to take her but the family's wage and benefits continue to be messed with that make this too complex to accomplish without the relief needed. State and insurance systems are just refusing her access to specialty care; there reason is only stated, as "It is ugly or angst".

121.     The parents are not cared for appropriately medically either and neither is the son. Currently experiencing falsifications even in vital signs at health

care facilities. All family members need care but the two youngest are in dire need of specialty care that the State and Insurers refuse to give without minimizations and falsifications, even currently out of state although the family has a multistate plan.

122.       The family is being refused medical care records from hospitals and doctor offices, refused abnormal findings unless asked for specifically by the test, refused copies of local physician EMRs used in the electronic exchange, refused acknowledgement of mesh product used in St. John surgery, or given modified or altered duplicate versions of medical records;

123.       Questionable physicians without credentials or providers the family has watched turn over name tags or refuse to give their name, continued to be forced on the family in their private medical situations.

124.       The plaintiff children have never had the opportunity to regain that same neighborhood camaraderie they had with like minded and valued children from their poisoned home neighborhood. They deeply miss those play relationships and connections they had that supported them in sickness and in health. The need to move from that first poisoned Broken Arrow home, negatively affected many lives to include the children that came over to play and their families who relied on the family for a positive outlet for their children. For those who continue to cherish those memories, the plaintiff family's home has become a stop of sadness over lost memories when they felt the plaintiff family home would be a home to visit for a lifetime.

125.       Could not attend camps without approved nursing care and extensive response planning.


**VII. Particulars on Predicate Act Examples for Consideration**

Details overall under RICO seek to show how the problems listed would not otherwise exist or be heightened in collateral damage if there were not repetitive acts over years with multiple culpable persons offering a dishonest service. Which is the main problem that has continued that Oklahoma Keeps seeks solution for. What is perceived by bad actor Health Care, Provider and State Insurance armies as planned and preventative defense to minimize collateral negligence causes more collateral damage physically and emotionally in medically necessary healthcare and agency assistance for those proven toxically exposed. In example, changing complex diagnoses of untreated or undiagnosed multi system disease or early stage cancers into Obesity, Diabetes or Alcoholic Liver in patients who do not even drink. Oklahoma Keepers alleges the denial of true facts in health; their monitoring and medically necessary care in the matter of predicate acts used is organized crime should be charged criminally as organized crime under RICO laws. They pose this on a national level to stop disrupting the flow of commerce in the state and the nation and to solve the problems of the family and communities facing corruption over health findings, health costs, disparities in care, loss of quality of life, losing property and subjected to wrongful deaths.

126.       FRAUD: denial of medical benefits or right to payment in the plaintiff family

   a. In example at the end of 2014 false deductibles and a false plan change were imposed upon the family in fraud to avoid the full costs of surgery. This happened when the family moved from Broken Arrow to Norman, OK and

went on COBRA for their Blue Cross plan with the plaintiff father's automotive health insurance through employment in Tulsa. After paying premiums for the year, the family went to their child's ENT doctor on December 2nd with the mother's surgery scheduled ready to do pre-op that day or the next day and found out through the doctor her plan had been changed although the plan had already been paid through the end of the year and all out of pocket had been met. However the doctors office threatenly informed the family their deductibles had started over in December and they would have to pay for the visit in fraud. But the family had proof the payments had been made for the other plan number through the COBRA administrator. Paying for the plan through the end of the year, there was no change. Additionally, the dealership had been informed in writing at plan election that they could not change the plan without notice to the family, but it seemed they had or that was what the family was told.

b.  In a shortened back-story: there were a lot of interests involved in the family's election of Blue Cross away from Community Care's antics to include the family's true health needs failing to be met, failures in case management and with a complaint to the Oklahoma Insurance Commission, recurring costs to the family in each calendar year, costs to the dealer employer for the family, a plan administrator agent who it was later found at a community meeting attended by the plaintiff mother that agent was also was a campaign manager for a local Congressmen of consequence or ethical dilemmas unknown. When the plan change still failed to meet the family's real health needs leaving two of the children and the mother without care and the loss of their continuity of care providers seemingly in consequence to the toxic exposure findings and relationship proof with Dr. Mills independent report to EPA assigned by poison control, the father elected to take the Norman job he had been repeatedly offered to give the family more money to afford health costs and to try new doctors not persuaded wrongly against the family.  However none of these things worked out due to the continuations of organized crime infiltrating across multiple businesses.

c.  Even now in 2017 the family worked with an agent on Blue Cross to set their 2017 ppo multistate plan to make sure it would allow the family to secure specialists out of state and be a payer source there but they are still not allowed to have the out of state payer source. A fellow at Washington University in St. Louis blocked care access to the doctor, regardless of awaited appointment, travel and confirmation of the appointment with the selected doctor even an offer for the family to move to the state if needed and proof of relocation address to a family member's home. The fellow instead created fraud to mislead the doctor that the child's need for care was not urgent and that her diagnosis from a highest level diagnosing facility was wrong or that the records the mother sent ahead and brought were wrong or false. After the disturbed appointment interrupted without permission by the fellow, the child moved into a very acute life threatening state requiring specialty care to follow her even more, the fellow blocked the emergency call and also falsely told his superiors the mother had no way to determine how sick her

child was "how did she know" only a doctor could determine but a later skin biopsy confirmed she had chronic illness and the mother was right once again. He further fraudulently accused her of being racist to detract from the real issues with the child's health. He falsely eluded to this for her asking him what medical school he went to in order to understand what medical school allows him to purposely harm a child, leaving her in distress, to disregard a mother who has a record of knowing and is repeatedly right when physicians misread or disregard even with severely abnormal labs that evolve into life threatening illness, who has been charged by her physicians with a patient centered home and trained in taking vital signs and forced to buy vital sign equipment by her physicians.  Since he admitted he went to medical school outside of the US she noted to him the way he let the child suffer was either in organized crime, no oath to do no harm, he was scared in politics of the family's situation that there might be a consequence for him to do what is right for her as she repeatedly asked him why he wanted to hurt her child. Trying to understand why he would continue to block her child's care and who gave him that power had absolutely nothing to do with race. The plaintiff mother has continued to ask Washington University and now Children's Medical Center in Dallas with OU who wants to hurt their child what is the reason and whom is it coming from. Texas Children's has stated that the children cannot return there because they do not have a payer source although the family pays for multistate insurance under ACA and the Blue Cross plans are usually interchangeable for Oklahoma patients.

d.  Other specific instance examples are when a nurse in a Dallas hospital wrongly provided a course of labs to either falsify results or make results look inconclusive to delay and deny treatment or harass the family at 8:00 p.m. on October 30, 2017 against the need and advice of doctors who seemed to be acting legitimately. Or in 2013 when a children 's clinic falsified an IG lab level for the plaintiff son in the family through a Tulsa hospital. Additionally in 2014-2015 when a pediatric pulmonology physician at OU Physicans as a part of the Children's Hospital at OU failed to disclose abnormal FEV range levels in the record but documented levels as normal, misusing normal. That same physicians falsified the father stating that the son was better off IG replacement when she did not even discuss replacement with the father and she falsely labeled the son with Social Maladjustment in the record and never discussed with the patient or the family. The family feel this should additionally be charged as fraud as documented.

127.    CONSPIRACY TO COMMIT FRAUD: when acted in agreement and concordance, both written and spoken in the activities of

a.  On October 31, 2017 3:45pm — Melissa who answered her last name was "YouDoNotNeedThat" from Risk Management OU Physicians returned a call to the plaintiff mother when she left a message asking for the actual reason the family was fired and the reason her 11-year-old daughter could not be seen for follow up of needed nephrology after hospitalization. The child was dismissed early and not well other physicians had placed a concern over this and not just the mother and father. The OU Nephrology clinic

agreed she needed to be seen but could only refer the family to nephrology
in Texas because Risk Management would not allow the family to be seen by
any OU Physicians which was prohibitive and not convenient for the family
and not agreeable by all access points in Texas. OU Physicians has
enlisted most all pediatric specialists in Oklahoma under their umbrella,
the family continues to be told there are no pediatric specialists to meet
their child's cardiology, pulmonology, immunology, rheumatology,
infections, nephrology and more except at OU, the plaintiff mother has
been a donor to her alma mater university but is still declined access.
She speculates from Corporation Commission cases on Oklahoma earthquakes
and defense by OU leaders maybe because she was not able to be as big a
donor such as Harold Hamm seemingly noted in earthquake cases and labeled
as a friend to the University and that the elevated chemicals were found
in the plaintiff mother's name.

b.  Melissa in OU risk management said, "While the child does need that care,
that dismissal from 2015 stands and will not be revoked. In 2015 a policy
was in place that was approved by the Oklahoma State Medical Board, that a
patient (or patient family) can be fired from all OU Physician clinics if
any conflict is identified for any reason". Melissa would not answer the
reason for the conflict she would only say it was in the medical record.
The plaintiff mother explained the problems she had with the medical
record, how pieces were only issued even pieces she knew were there were
often withheld. She had to ask specifically for parts. Melissa made the
assumption someone had discussed the reason with the family before sending
the letter. But Melissa refused to answer as to who in the record said
they discussed with the family. Melissa also explained in assumption
having the name of anyone would not get them to change their mind. When
the plaintiff mother wanted the name to know who falsely documented they
explained everything to the family when they did not. The letter stated
they were fired for getting a second opinion which validly the Oklahoma
State Medical Board cannot consider a conflict — any reason would be a
violation of rights even OU Physicians' own list of rights. It is not
believed the Oklahoma State Medical Board would allow a child to go
without care for kidney function over a second opinion on her brother
whose tumors were not being fully diagnosed or treated.  The mother tried
to explain she had a right to due diligence instead of assumptions or
false facts, to correct information for such a reason with such
consequence to the family under due process. Melissa tried to tell the
mother she could not record her, the mother explained a police officer
told her husband they could record anyone as long as one party talking in
the recording knows they are being recorded.  Also the mother father, or
children record now often in their own protection to be a tie breaker of
truth if needed with so many bad actors littering alternate facts falsely
in their records for sometime now. When all the family is doing is
reminding of truth and trying to get the care the parents and children
need.

c.  Other clinics at OU have disclosed the patient or patient family firings
are a trend for families who even talk to Risk Management, they just get
fired now. So the plaintiff family is not the only family getting thrown

to Texas for care. When there was something bureaucratic blocking their child's care that OU actual doctors working in the clinic knew was a need even emergent need or life threatening, it made sense to the families to try to work with Risk Management to overcome these problems as that is where OU Physicians funneled them when they just wanted to talk but were met like the plaintiff family with more angst instead that led to bullying and more blockages and more obstacles in care. Sometimes this even happened to employee or former employee families so in fact those they knew had legitimate needs.

d.  The plaintiff family continues to be targeted with workplace bullying in multiple health provider situations that caused additional health-harming mistreatment (with eggshell skull rule applicable the unexpected frailty of the plaintiff family not appearing sick because ambulatory, etc.). This prevented work from getting done or care from taking place with social, psychological lasting after the experience not just for the children as patients and the plaintiff family but the workers in the office who were valued and disagreed with the abuse of the plaintiff family and disregard for their true needs. Rules appeared to have been made up and passed to different culpable persons for the mistreatment of the family. Creating a hostile work and patient environment by multiple culpable person. Discriminating against the family as a protected class (discrimination based on health care status) under Human Rights laws, the children have been classified as Other Health Impaired classifying them with Special Health Needs and with disabled rights by health and needs that cost the system more than the average. The multiple harassing incidents may additionally fall under 18 US Code 2261A (1-2) — Stalking but with RICO remedy as a predicate act.

The following is just a few more memorable examples:

i.  Diane Hunter at Oklahoma ENT in 2014 was one of the most verbally violent in her treatment and provoking of the family while the mother was very euthyroid causing her multiple heart events as her thyroid care was being delayed for surgery. The mother had to hire a nurse or tech to drive her during this time as her health was too unsteady to drive 30 minutes from her home and her husband had to work so he could eat and her older children were too sick to drive that far also during this time, especially as cold weather was effecting them adversely and suddenly with troublesome symptoms. Those horrific events that Diane Hunter and others ganged up on the family with are provided in the recordings issued with this complaint. Amidst the hundreds provided to help the court discern truth from the defendants years of alternate created fact and to help the court understand the family was not violent, threatening or combative just speaking up, defending, trying to prevent false information and trying to be heard to straighten out fact as they tried to help their children get the treatment they needed first then continue to care for themselves so they could be there for their children.

ii. Jayme with Oklahoma Heart South In Oklahoma City wrote a
letter responding to the plaintiff mother's detailed
complaint in mail fraud accusing "she doubted the mother
could prove it". Although the incident she provoked to make
the family upset was on the hospital's security footage.
Did she erase it?

1. Why would the administration allow the employee
involved in the complaint to respond to the
complaint?

2. This was similar in ethics violations and conspiracy
to what the Oklahoma Insurance Commission did in the
plaintiff family's insurance complaint the way they
let the insurance company respond for the
Commission. Which the accused should be able to
respond to the Commission not to the complainant on
behalf of the Commission. That alone seems to
illustrate corruption.

3. At approximately 8:00 p.m. on October 30, 2017
Alexandria a nurse at Children's Medical Center in
Dallas, broke procedures in taking blood to cause a
problem with testing on the 11-year-old child's
blood a Dallas doctor who had pulled the child's
records wanted to get the child the continued care
she needed for her kidneys. As doctors agreed
nephrology was needed but OU would not let the child
have this and this action by OU is putting the
child's kidney function in danger. Alexandria only
stuck the blood catheter into the skin and not the
vein leaving the vein part out, like a dart tip in
the skin on the child's very swollen hand after the
child asked her not to use her hand because they are
too swollen and painful with changes. Nurse
Alexandria did not hook up a syringe to draw the
blood but dripped it into the air and into a tube
below possibly purposely trying to expose the immune
deficient child to all sorts of ambient infections
in the hospital, as the nursing staff had been
testing the validity of the child's immune deficient
diagnosis and then adding saline into the tube with
the drips it is assumed to falsely make the child's
blood look more hydrated. Even if the nurse did this
in front of the parents to show how others with OU
might have changed her blood to dismiss her early
without fully treated kidney needs this was done in
harassment to the child and the family and to
falsify or skew results in order to possibly refuse
to treat the child against the doctor who sent her.
It was to show the parents she was not safe and was
outrageous that this hospital too had been

infiltrated by organized crime or the knowledge of it across state lines and not just in Missouri.

4. Dr. Thomas Khuls in Summer of 2014 telling the mother he would make her son's pituitary tumor go away by "taking a new scan to make it gone", after he had changed his documented liver tumor to a "gas bubble hiding it" on a repeated ultrasound. When the mother informed him a gas bubble, if true would make the test inconclusive and to need a repeat but he refused. He also refused to treat the youngest child with immune deficiency and medically stolen IG therapy for a direct exposure to strep. The child's strep pneumoniae exposure increased in her sinuses with his disregard and led to the need to surgical remove infection as it was reaching skull bones by late fall of 2014. This surgical need still without IG therapy warranted another hospitalization for pneumonia with other post surgical infections that remained disregarded by May of 2015 in the then 8 almost 9-year-old-girl.

e. Limited plaintiff family access to due process with only ineffective legal council for the toxic exposure was another conspiracy to commit fraud that recurred;

f. The abuses of power that occurred from the City of Broken Arrow saying in a letter essentially you cannot have your tort claim money, because I said so and I am the government so I am the law. To Sharing double standards for men over women in the doctors office or in medical record placing statements of the mother on the father or making the father the historian when it was the mother even if it was to help the child because OU Physicians and others had been creating alternate fact in the record of the mother's incompetence.

g. Primary Immune Deficiency in multiple family members has been diagnosed by a highest level PID diagnosing facility and requires IG replacement for life as a mitigating therapy however since finding exposures and proving relationships to health, insurance and/or the State of Oklahoma has repeatedly stolen the required therapy from the plaintiff children, and now the mother too, disrupting the mother's treatment from 2010 to present.  The patients labs on therapy are brought to near normal levels as is the therapy's purpose but the insurer and or State misconstrues this information to try to say the therapy is not needed with normal levels. The more you fight this and share what is happening the more the family is bullied and loses more access to care similar in the way they are treated by OU Physicians. They also misconstrue it as not working if the patient needs antibiotics, contrary to the standard of care, treating physicians and medical advice from highest level specialty physicians the therapy does not keep away the complete need for antibiotics and patients can have autoimmune with immune defects and do need additional care for that but a bureaucrat misconstrues this in the family's care to limit costs for care.

i. The plaintiff family's Primary Immune Deficiency is

diagnosed by multiple experts in agreement as a defect coming from the bone marrow but is often falsely disregarded as an autoimmune situation that will get better.

    ii. Blocking antibiotic access and ample extended treatment times although is protocol for Primary Immune Deficiency patients on and off IG therapy.

Other examples of problems in conspiracy by multiple culpable persons:

b. Some doctors have been forced to tell the family, "I have a pituitary tumor too and I am fine" or "thyroid cancer is the good cancer".

c. A pituitary tumor in a pre-teen child, with hormone disruption with abnormal tests, salivary duct tumor, liver cyst or tumor, thyroid cyst or tumor that are known to turn cancerous by similar chemical exposure relationships in other states continue to not be fully diagnosed against advocacy and complaint by the parents are not fully diagnosed, treated and are no longer monitored possibly to make them looked healed or treated.

d. ASD and PFO and other heart damage or defects not followed, sometimes undisclosed or treated.

e. Asthma therapies are repeatedly taken away or receive limited access against continuity of care treating physicians.

f. Forced steroid and steroid inhaler use, Leukotrine Medications or other watch and wait or lower level therapies keep being forced against best odds and the advice of treating physicians.

g. Patients with primary immune deficiencies do not get better but Oklahoma continues to challenge for over a decade for multiple patients that cause infections that need surgeries, damage tissue and more.

h. Parameters for treatment keep trying to be changed by bureaucrats as a means of avoiding costs for care in health care or services in public schools.

i. School staff and nursing staff have served in the conspiracies knowing they do not have permission, in writing to contact the physicians without a parents' consent.

j. Possibly metasis is shared by physicians in conversation but not documented, tested for properly or treated.

k. Reproductive cysts or tumor findings are not diagnosed treated or properly addressed.

l. A patient is dumped and then their condition is falsified as preexisting.

m. Autoimmune responses also effecting organs now are not secondarily diagnosed and separated from immune deficiency, as is the standard of care.

n. The family is forced to sign blanket statements or a blank small screen with no supportive info for even life saving care or medical records release but the family has to wait longer or is confronted or bullied when they opt out with the signature as an added note or on the papers in writing. If they decline to sign they are fired or

told they cannot receive even life threatening care.

o. One family member is told their liver levels are abnormal and to wait and check again then fired by their treating doctor the other family member is told their heptomegaly is fine because the liver levels are normal, there is only concern when liver levels are high.

p. When mesh started being discharged and found the patient was told, maybe you eat string. St. John hid the records from release about the propylene or similar mesh used in the plaintiff mother without her knowledge and hired a paralegal to close the Obstetricians office. The foreign body identification at the lab was also cancelled as a test to determine what kind of mesh was discharging from the plaintiff mother's body 10 years after her partial hysterectomy and why.

q. After an MI Stemi heart attack from Myocarditis a heart cath was needed to be certain there was not a blockage at Norman Regional Health System. A drug urine screen was done after the heart cath, it was positive for the drug just given during the heart cath. The hospitalist made the admitting diagnosis Myocarditis and Positive Drug screen for the drug. So the hospital purposely tested after and gave the no illicit drug use patient a false drug user diagnosis.

r. While having an issue of obstructed blood flow requiring an ER visit at the patient's cardiology hospital, the ER tried to force anxiety medication instead of help with the problem vein obstruction waiting for surgery diagnosed in the chart. They disregarded the patient's elevated symptoms and state and made threats at her unconcerned about the problem even before the physician evaluation. Due to a previous experience the patient was told to carry a note about EMTALA or mention it. It did not help the doctor came in as dismissive as the triage nurses.  The patient asked to leave, although in danger. Even with request for the House Supervisor Jayme the staff would not free the patient from the IV and monitors. They claimed to hold her hostage until she signed an AMA or APA form. When she struggled to get them off herself they falsely accused her in the record of being threatening or throwing things at them. When her episodic shaky hand could not get the heart monitor clip off and relieved when finally done she dropped it on the bed to leave, nowhere near anyone as the mother is never violent. But the nurse who would not help only created drama and false fact with no concern for the ill patient who later had influenza and was treated for it.

s. The plaintiff family's very sick child in respiratory distress might only receive a small bag of IV antibiotics and fluid then sent home from the ER only to return again and again in collateral negligence.

t. The good and authentic chronically ill 11-year-old child's mitigating medication required for her underlying primary immune deficiency diagnosis was stolen again by a letter from it is

assumed the insurer in March, 2017, no copy was provided to the
family although it was about their child's care and it was used to
stop therapy from the Accredo Specialty Pharmacy who refused to
provide a copy of the letter to the family. The specialty pharmacy
refuses to release the letter although release request has been
sent in writing more than once.

u. Norman Regional Hospital and the local Health Net EMR resource
would not provide records without asking the source if the family
could have them. When the source said no, they were not provided.

v. The miss use of HIPPA and EMR for the use of created alternate fact
and to keep information away from the patient has become an
egregious problem for the plaintiff family.

w. Primary Immune Deficiency without access to mitigating medications,
followed specialty care and swift access to treatment is serious
and life threatening and is not in any way shape or form to be
confused with or considered the same as Autoimmune Disease either
in error or maliciously, although if mismanaged can also become
life threatening. There is a recurring bureaucratic problem with
that. Although maybe a poor example not meant to be offensive, that
would be like confusing ALS with Migraines.

x. In September, 2017 when the youngest minor child suffered a
vasculitis attacking her kidneys, skin and blood vessels bringing
urgency to action for this claim the family found that EMTALA laws
were not enough to get her admitted as the created alternate facts
caused blocks to her needed admission, let her get more and more
life threatening with limbs at risk until the family finally found
a way to being admitted but not without a balance of care, undue
stress, reported harassment and seeming new created alternate fact
to possibly damage the character more of the family and possibly
the 11-year-old child herself now. The family would like to know
why and who is changing the admitting criteria and how it is
causing distress and long-term illness to many patients in Oklahoma
and Texas communities.

y. A path to pneumonia with remaining edema and atelectasis still
unaddressed occurred last time a similar undue predetermination was
done to the youngest child in 2014 as a consequence of taking away
her IG therapy at only 8 to 9-years-old. Her brother has suffered
with physical change and deformity from abnormal growth and
metabolic bone changes from exposures, a heart attack with
myocarditis at only age 18 from similar longer-term actions to him
that can be related to stolen IG therapy that continued to be
denied in severity and the larger cause and relationship.

z. The sample predicate acts are not limited to these actions.

aa. The attorney who represented the family on behalf of PSI admitted
his conflict of interest as a family member of Continental Oil but
not until the date of the mother's long awaited Social Security
hearing. The EMT he mentioned made the mother look favorable in
private pre hearing discussion was removed from his job the next
day under what seemed like false pretenses.

bb. It is possible it should not be ignored in possible criminal
proceedings in determining origins of bad actors to the family,
that the plaintiff mother was a University of Oklahoma Student
Association Vice Presidential Candidate with a Minority Student as
Presidential candidate whose campaign plan was effective and won
taking the reign away from an old guard on campus in the 1990s.
False charges were created at OU in order to steal the presidential
election and there was an outrage of the bureaucracy used while the
plaintiff mother was in college. David Kendrick was involved with
those who made those false charges that the plaintiff mother walked
away from because she and others on campus found it to be
unbelievable someone wanted to win a campus election so badly they
would make false charges in order to not concede the others' win
that was by the books. David Kendrick held on to his later win in
his bio even later as a physician and he ended up in a business
meeting with the mother and she barely remembered him but he stated
"You stole our election" some 20 years later. The woman who fired
the family is Lynn Mitchell who it can be found has strong
associations with David Kendrick in business. Kendrick has become
very instrumental in the national electronic records processes
today feeding in from Oklahoma health care. But he did show what
seemed to be genuine concern in the same meeting when the mother
explained in transparency to be clear with expectation for her
professional abilities at the time that she could not travel across
the state anymore due to her son's very unstable health who was not
ambulatory much during that time and also the problems with her own
health. It simply returns to be a point of wonder because there is
a conspiracy plan effecting the family and being communicated in
some way through some source, even across states now.

128. EXTORTION: taking payments back, sign for service activities etc
   a. As an example, Blue Cross and Blue Shield took payments back for the
   youngest child and possibly the mother from their last Oklahoma
   immunologist and held their payments hostage for other patients in the
   practice until the individual health business returned the payments. It is
   known Blue Cross and Blue Shield did something similar to Classen Family
   Medicine that caused them to patient dump the family, setting up an
   argument with false information to the family. Superintendent Nick
   Migliorino with Norman public schools and his nurse Rhonda Brown operating
   for the school under him in his superintendent office played a role in
   this when the mother spoke up about the nurses from the school illegally
   contacting the youngest child's physicians to change and minimize her
   parameters for specialty care and asthma medications against the standards
   for specialty care that the physicians were abiding. Proving infiltration
   of school to the healthcare sector in specific illegal activities as a
   part of organized crime.
   b. Making individuals or families sign something for payment or service in
   order to receive needed care is always a forced situation under duress and

makes all contracts unless reviewed and approved by the plaintiff family
in court, invalid. The family's premiums were paid they had a right to
care without forced imposition and changes to those rights in multiple
states for whatever care needs were there. The family's notations on
papers and later notations on signatures proves this was done under duress
or the signature was required to get service although the provider will
try to portray it was elective. And services are medically necessary for
the family.

129.     MAIL FRAUD: anything mailed with purpose is to scheme or intentionally
deprive another of property or honest services.

    a.  Unlawful debt also disrupts the flow of commerce; to include
disruptions in plaintiff family and the community's fair wages and
abilities to make a living, spend money on goods and services to
create local tax revenues to support social service systems
declining and in financial ruin in Oklahoma. There should be an
audit of double dipping on deductibles when employees change plans
in the same calendar year. There should be an audit of the
plaintiff family's bills and charges that exceed and seek to
collect when insurance did not pay, although premiums paid, out of
pocket or co-pays met and the family was billed. Due to the untruth
and unreliability of the insurers these findings should be
confirmed with the plaintiff family.

    b.  There are other forms of mail fraud expected to be found in the
discovery process of criminal proceedings.

130.     WIRE FRAUD: phone calls, emails or faxes, etc. anything sent by wire that
direct or portrayed coincidental purpose is to scheme or intentionally deprive
another of property or honest services.

    a.  In discovery this will include when an office deletes a file, misplaces or
throws out or removes faxes from the file.

    b.  Insurers in multiple states have committed this by switching case
managers, switching who is assisting with non-payment and more with call
contacts and follow up calls.

    c.  The Environmental Protection Agency did this stating a certain person was
to help with health questions then she stated she had no authority to help
with health, then the family was asked to send a fax to Blake it was a run
around to avoid honest service, then a physician was appointed who
admitted his job was to replace the report linking illness and not to see
the patients for an honest service as Jatim Mistry continued to Mislead
the Family

    d.  Nicole with EPA filed the disinfection by-product rule with the Oklahoma
State courts after she told the plaintiff family the levels were not
illegal because the state had already changed the levels through a new
disinfection by product rule. Denying the family the honest service of
providing response to illegal levels.

131.     WIRE FRAUD: phone calls, emails or faxes, etc. anything sent by wire that

direct or portrayed coincidental purpose is to scheme or intentionally deprive
another of property or honest services.

These are just a few examples from the very lengthy timeline of organized crime the
family continues to experience.

From this continuing, egregious and malicious pattern of racketeering and extortion by
Defendants, in violation of RICO and Hobbs, and also because Defendants are:

1. when or if a contract was not under duress, in violation of contractual
fiduciary duty, before and through beginning litigation and complaint processes that have
occurred.

2. as well as common laws prohibiting fraud, extortion and theft.

3. the accepted "way of doing business" in the current economy with health care
delivery system changes is no excuse.


Plaintiffs allege further that as a proximate cause of Defendants' Pattern of
Racketeering activities, Plaintiffs have suffered, great, permanent and irreparable
physical, psychological, emotional, spiritual and financial harm and damage, all of which
has left Plaintiffs destitute, unable to work in at least recurrent cycles and continue
their careers in the matter previously available to them now unable to live as present,
reliable, independent and self-sufficient and self-supporting productive human beings as
they always were, free of invisible or visible disability.

132.        **VIII. Need Help/ Ongoing Concerns:**

The family is appreciative they are still alive; thanks to the care they have
received in the past and intermittently currently. They know there have been many
who have tried to help but therein lies the wrongness that as the doctors who know
and decide what is medically necessary those rights have been additionally stolen
from them.  Many physicians have only been able to try to advocate as the family
has seen a lot of people who when the visit is in truth or not corrupted with
extortion or fraud, etc. agree the fight for health continues to be medically
necessary.

The infrastructure replacement is not in vein, as the Country is experiencing
abnormal water delivery system deteriorations and in need of repairs and remedies.
After the disturbance and leaching into the line from construction and repair
settles it is bound to help restore more health to all with less recontamination
being introduced so treatments can mitigate more and work. But is known it is not
a total solution for treatments and wellness when it comes to health. Stopping the
wells for earthquakes did seem to help the family with the continuation of
unbearable more electrically charged sensitivities that occur.

e.  There are on going needs for continual help with hormone disruption and
extra nutritional supplementation;

f.  The tissue, organ, bone, metabolic and multi system injuries continue to
cause or make all family members vulnerable to weather changes pre and
post storms, heat waves or cold fronts, new community exposures and
community illness and diseases;

g.  Diagnoses and treatment of unidentified tumors and cysts that even if
benign in appearance are known to turn cancerous. The son still has
undiagnosed or treated tumors, is currently muscle wasting and dealing
with organ and red blood cell dysfunction that is not being diagnosed
fully or treated either;

h. There are medically necessary on going needs for interventional therapies, mitigation, surgeries, medications and self care therapies;

i. The illnesses are undeniably and proven now lifelong and require medically necessary monitoring and care;

j. The family and extended family can no longer self support these identified problems and the State of Oklahoma has expended its resources for a number of reasons beyond the family's concerns;

k. The family needs funds for expenses and to afford resources to test their new or current home, purchase a new home to once again secure an owned but safe place to live for life, purchase clean spring water from outside the State and to pay for water filtering and off gassing systems that purposeful restricting their wage and ongoing medical costs has made currently most not possible, leaving exposure to more contaminants and algae bloom cycles with additional hypersensitivity;

l. The family needs ongoing accommodation to work at all or to take classes to continue a love of learning;

m. Rodent and human research on the exact chemicals experts related to exposures, proves how even small levels of cumulative exposure cause end organ damage such as is now found in the children, adults and pets that is continuing to match research;

n. The plaintiff family needs more expert care, continuous self-care, supportive therapies and not less care;

o. Due to ongoing illness and captured recurrent severe health episodes in the adults and minor children, immediate injunctive and declaratory civil relief is requested before one of the plaintiffs or another extended family member loses more function, dies, suffers additional irreparable physical harm from untreated and unmonitored health conditions that doctors have said require medically necessary care, becomes homeless or completely unable to provide.

p. The mother, father and children require out of state, higher level specialty care with travel funds, lodging, and full care costs covered.

q. The family dog, rescued from Broken Arrow in 2012-2013 after the dog with cumulative exposure died, has medical care needs.

r. But not limited to this list.

X. RIGHT TO RELIEF AND NEED

2. In July 2017, a U.S. public interest law school reviewed the plaintiff family's exposure documents from experts and assured the family

a. 1) There is a toxic exposure case with illnesses that are real and relate.

b. 2) The law school committee disclosed from their research of other cases, the chemicals which are in the Trihalomethanes (TTM or TTHMs they are also termed) class, such as the Plaintiffs, were used to clean hydraulic fracturing chemicals from the City water. In the plaintiff family's opinion this makes the State of Oklahoma itself a conflict of interest in the case.

c. 4) The family has also become aware of Superfund site ground water chemical run off as another possibility to further contaminating their water through broken infrastructure and an understanding of how that occurred.

    d.  5) The youngest child suffered a life-threatening bout of vasculitis and acute kidney failure or injury during September of 2017. So the damages are not over they continue in reality but the family is still not provided effective representation. The family had to fight hard to get her an admit to save her life, the EMTALA laws were just ignored or engineered around unjustly until a path was finally made but cut short.

    e.  The family's wealth has been slowly but surely expropriated and continues to be treated as if they are subject to legal restrictions without due process of law. They have never knowingly agreed to or signed anything taking their rights or the rights of their children. Signing a computer screen to have access to life saving care or a computer screen to have insurance would never do that for the family. That too must be treated as created alternate fact and not a contract as the family has opted out of multiple paper contracts they could see, and remains savvy about the army of litigators who spend the health care budgets to block, inhibit or stick it to the patients as current United States Senators are calling it in their possible pursuit of justice for the public interest.

    f.  The parents fair wage with benefits, continuity of care physicians, quality of life, close proximity to their extended family, community support system, and property with ownership they had made multiple payments on and worked for are being and have been disrupted, stolen with multiple RICO predicate acts and their decreased abilities due to proven toxic exposure.

XI. DAMAGES SOUGHT FOR RELIEF

3.  As remedy for Part One, Immediate Injunctive and Declaratory Civil Relief  - The amount requested is sought in precedent of the request provided by **HAMMEL v STATE FARM, 1999 USD WD of NC No. 2:99-cv-44-T (104)** the relief sought was $30,000,000.00 per plaintiff. The plaintiff family has decided in agreement to adjust this amount economically for the State of Oklahoma's recent hardships although the family has experienced unreasonable and unusual hardships due to failures in duty to act, incompetence, negligence and criminal actions. So the plaintiff family is preliminarily requesting $16,000,000.00 per plaintiff in the family as their civil relief request if immediate and declaratory for a judgment for compensatory and punitive damages.

    a.  This should provide recoveries for lost wages, disrupted careers, loss of established and planned future business ownership, professional organization leadership and membership, worker status, loss of earning capacity, other financial ruin, quality of life change, alteration of lifestyles, disrupted education, education inequities, property loses, everyday pain with serious injuries, recurring and past physical illness, recurring and past physical sickness, disfigurements/lasting childhood growth disturbance, sleep-wake cycle disturbance, hormone disturbance, allergic sensitivity, elevated risk of cancer, recurrent cycles of illness, end organ damage, tissue damage, lifelong medical need, dismissiveness over health complaints and care needs, pain, suffering, blocks to achievement of acceptable goals, defamation of character, social support family separation, grief as emotional distress, intimidation, harassment, disruption of care, retaliation for reporting adverse events,

premature death possibilities and increased incidences of life threatening medical need, unreasonable and unusual hardships all of which were are not limited to these areas but were induced or heightened by exposure to bromodichloromethane and chloroform alone.  Natural gas leaks and other contaminants disclosed and not disclosed in Oklahoma Keepers communities, as a cumulative toxic exposure should additionally consummate the amount.

b.  There were additional and multiple unmet responsibilities under law for the Comprehensive Environmental Response, Compensation and Liability Act otherwise known as CERCLA or Superfund when exposures were revealed in 2012 testing and findings by experts and state agencies as affecting the plaintiff family. Due to found government incompetence with failed duties to protect, bad actors with political agenda over public interest and limited response to public health needs, removed jurisdictions for health response to exposure and other known predicate acts the family is planning to earmark $1,000,000.00 per plaintiff, $5,000,000.00, for the creation of the Oklahoma Keepers Foundation. This will allow the plaintiff family to help create a health response by directly funding research for their communities to improve health monitoring and understanding healing needs and/or course of disease from environmental exposures. This research is planned to monitor samplings of tissues and other biologics from a sample of Oklahomans in affected areas from the exposure time and a future time. It is the plaintiff family's experience that has led to a recommendation to take that vested interest portion of those failed duties away from the State of Oklahoma and place them back in a recovery plan for public interest. So that the people of Oklahoma can have a layer of truth provided to them separate from state economic and political fears or malice in found exposures.

c.  Due to the continued unknowns and lifelong needs for medical at unknown costs, the driven, hardworking and self-motivated plaintiff family did pay for Social Security disability benefits and expects to quickly resolve their fight and receive them with ease and truth in medical need. Without further consequence or blocks on the non-penalty Medicare access side as past due relinquishment and as restitution in punitive damages for Federal Government harms from bad actors under government name.

d.  Benefit Relinquishment is requested not just for the plaintiff family but additionally their extended family members who have been restrained or denied benefits no matter the imposed reason to include but not limited to family military personnel and those with current or future survivors benefits. Three additional extended family members who suffer extenuating circumstances for the premature deaths of extended family members due to medical negligence and or undetermined environmental exposures but had no inherent rights to or aged out of survivor benefits and no access to legal representation, should additionally be provided for to include back pay for deprived extended family and ease of future needs and use without any negative consequence or harassment whatsoever for both the plaintiff family and extended family.

e.  The plaintiff family also expects records restitution for correction of falsely created documentation and assumptions, interferences with parental rights, removed false behaviors or labels as a legal and equitable benefit

of relinquishment. To additionally include unblocked and unrestrained
future access to view, inspect and/or have copies of records and
unrestrained abilities to correct any future records or missed needed
repairs without conflict. This should stop the need for a normal and
abnormal test result file, losing records from the file, etc. Some needed
corrections have been brought out in current Social Security Hearing
proceedings and others will likely be disclosed in criminal RICO
proceedings if this court allows that request. This should additionally
order medical establishments to stop harassing and causing difficulty to
the plaintiff family and extended family in the medical setting.

4. Such compensatory and punitive damages under 42 USC S 1983 and FRCP 9.1. A and
9.1.B in any judgment form are non-taxable and non collectible against the
plaintiff family members and should be ordered as such with the relief judgment to
help with anticipated future retaliation from bad actors. The damages are plus
interest, as may be verified and claimed by the persons and entities upon whose
behalf Plaintiffs also complain, by virtue of existing contractual agreements.
This is in the case of a recent treating physician who is not a bad actor to the
family. In accordance with FRCP Rule 71 the judgment for the plaintiff family
would claim right for relief but those creditors must be on the plaintiff family's
submitted list at judgment as good actors. If defendants are identified by a
plaintiff or in RICO criminal discovery as bad actors then any contractual
agreements are null and void with that bad actor, waiving their rights to any
relief;

5. Under the IRS Restructuring and Reform act of 1998 the plaintiff family requests
relief with independent oversight, efficiency and effectiveness on the plaintiff
family's behalf to look at what occurred during the racketeering period. Internal
Revenue Service of the U. S., plaintiff family audit proceedings from 2009-2010 to
current were anticipated false and possibly a part of the inappropriate criteria
identified as a potentially political case probably not known to or remedied yet
by the Treasury Inspector General during the period of continuing pattern of
racketeering activity.

   a. Plaintiffs also complain this happened as the exhausted plaintiff family
      fought to overcome their son's prognosis while treating repeated cases of
      pneumonia in the youngest daughter at home and previous as they fought to
      diagnose their children. This imposition of debt was oddly in the year the
      plaintiff paid the most taxes ever in record, the auditor retained it was
      alerted because the mother moved back from probono community work to
      employment in marketing with Saint Francis Health System.

   b. The true audit payments made at over $250 additional per month was then
      near doubled later by the IRS this was in addition to paycheck tax
      withdrawals. It is anticipated unfair taxation for the plaintiff family
      will be found especially starting during this time.

   c. Lauren Zeligson may or may not have initiated the labeling of the
      plaintiff family's tax files as potentially political through her
      husband's access to tax files. The family questions if she received
      compensation for this additional uncalled for adverse event put on the
      family.

   d. The plaintiff family couple denies signing anything that says they could
      not set any future payment plans with the IRS but the Oklahoma City tax

advocate tried to impose this appearing to cover tracks during a later complaint, she even suggested there was never an audit on the family but the family never missed a tax filing year and made any balance payments in full until the time of audit when they seemed to try to pull more from the family already financially stressed with exuberant medical over $900 monthly co-pays for IG therapy in addition to premiums and other out of pocket costs for three family members soon to be four and additional monthly medication costs.

e. These actions caused undue stress and cost prohibitive complications with making future payments.

f. When the family found a way to work harder and make it happen, the IRS retaliated as a result to include lost payments by the IRS put into multiple accounts and not properly accounted for left in some tax years as overpayment not returned. This should be reviewed in criminal RICO discovery, as all payments were taken from the family's previous Arvest bank account of over 20 years by electronic to an IRS approved payor source prior to their own electronic processing or by check.

g. If for any reason that audit, lost payments and continued false balances that took the family's refund even in poverty last year is declared valid during discovery of although imposed true or untrue debt amount and in truth was not satisfied in any way, the defendants will additionally pay the balance and make sure the family regains its good standing with the IRS. This is necessary by virtue of Defendants' destruction of Plaintiffs' ability to pay for representation to understand and resolve injustices with the IRS for years to come.

6. Any damages, plus interest, that may be payable and due, to the Court itself, in compensation for whatever relief the Court itself may have accorded the Plaintiffs; this, since Plaintiffs' inability to defend themselves otherwise is a direct consequence of the Plaintiffs' destitution, which is caused by the unabated insistence on a clear pattern of racketeering activity engaged in within the "enterprise" that includes claimed "insurance" which additionally left the plaintiff family injured and sick, incapable and without due process for found exposures and their health consequences. In light the defendants should pay those court costs.

7. All Plaintiffs' Costs in this litigation, and as well, just compensation for the destructive and onerous work and effort that has been forced, under duress and extortion, upon Plaintiffs by Defendants' actions; Plaintiffs request special consideration from the court in a determination of attorneys' fees, by the court, in recognition of the work done, and cost of necessary tools required to act as attorneys, Pro Se.

8. Restitution of all home and health insurance premiums paid to Defendants, over and above that which was paid as any minimum required by State Law, for any services that Defendants have purported to provide, over any time that State Farm has ever been paid for such purported services to include related auto policies back with the plaintiff mother back to 1987. Or when Blue Cross and Blue Shield of Oklahoma/HCA etc. was paid likely starting in 2005, Community Care and it's past/present affiliations with kinship insurers Pacificare back to 1997-1998 and United Healthcare's market place plan during 2016 only when they delayed and then denied the patient's care.

a. [Given, that these purported services, which have been provided in return
   for this money, were "insurance" in name only, and that Defendants'
   statement to the contrary was an act of deliberate and calculated fraud,
   which fraud violates and abrogates any agreement that may, in any way, be
   construed as contractual from any "insurance policy" with State Farm or
   any health insurer or their legal reserve, agents etc. Plaintiffs entered
   this agreement with good faith, while Defendants entered it not only with
   "a priori" bad faith, but with "a priori" design of fraud and design of
   extortion: this just happens to be Defendants' "way of doing business"
   which Plaintiffs understand as the very definition of a pattern of
   racketeering activity that goes well beyond the mere "pattern" that is
   understood, in multiple definitions by the various Courts of the United
   States.]

b. Restitution of all co-pays and deductibles paid to St. John and OU
   Physicians Tulsa and OU Physicians in Oklahoma City and The University of
   Oklahoma Residency Program or its legal protective name in Tulsa and
   Oklahoma City, its legal reserves, specific physician Residency and Fellow
   bad actors to be found by the court or later in criminal discovery, and
   more who the plaintiff family put repeated trust in for the standard of
   care and special care for the family's special conditions with needed and
   appropriate specialists and consideration for diagnoses and findings.

c. Such purported services were in "medical care" in name only and that
   defendants statement to the contrary was an act of deliberate and
   calculated fraud, which design of fraud and design of extortion: this just
   happens to be Defendants' "way of doing business" in a group who takes an
   oath to do no harm to any patient which Plaintiffs understand as the very
   definition of a pattern of racketeering activity that goes well beyond the
   mere "pattern" that is understood, in multiple definitions by the various
   Courts of the United States.

   i. In known name prior to discovery to include Lynn Mitchell, MD, MPH;
      John Sommers, MD; JW Hendricks, MD; Laura Chalmers, MD; Jennifer
      Freeman, MD; Thomas Khuls, MD; Brian Ellis, MD; Nigat Mehdi, MD, OB
      people; Amanda Wright MD; and Ashley x, Weins girl, Jayme OHH guy;
      para legal at Frame's office; Madhusdudan G. RAO, MD; and Sara for
      making it seem like their violations in the specialty care the
      children require and the standard of care they purposely violated
      in malpractice as a Such purported services were in "medical care"
      in name only and that defendants statement to the contrary was an
      act of deliberate and calculated fraud, which design of fraud and
      design of extortion: this just happens to be Defendants' "way of
      doing business" in a group who takes an oath to do no harm to any
      patient which Plaintiffs

   ii. Attorney Kris Ledford has no right to any portion of judgment in
       contract for past legal research for promising Jury trial but then
       being forced to offer a nominal $100,000.00 for lifelong medical
       and advising for the state instead of his client; feared taking
       payments from the State of Oklahoma to investigate but then
       providing ineffective or no services as plaintiff family council;

And finally, any further damages of whatever kind that the Court may deem

suitable, just or appropriate, to Plaintiffs, the Court, or any persons or
entities upon whose behalf the

**XII. DEMAND FOR CIVIL RELIEF JUDGMENT AND PART TWO CRIMINAL TRIAL BY JURY**

On the basis of all the foregoing, Plaintiffs demand judgment for the stated relief, and
criminal considerations with a special appointed prosecutor in a trial by jury.

EXCESSIVE FRAUDULENT ALTERNATE CREATED FACTS FOUND OR SHARED AS KNOWN TO DATE

    a.  False Positive Drug Screens created with medical procedures or acute care
        prescribed use Social Maladjustment Disorder;

    b.  False Malinger Accusations;

    c.  False Hypochondria or Munchausen Syndrome or by Proxy;

    d.  False Threatening and Combative Labels;

    e.  False Declared Racist Administratively at a hospital for asking their
        resident what medical school an inept doctor attended who allowed their
        minor child to become damaged or harmed;

    f.  Falsely listed Hypothyroid not as a part of thyroidectomy;

    g.  Falsely documented Repaired Atrial Septal Defect of a minor child's heart
        — not repaired;

    h.  Falsely sent for Allergy Care vs. Immunology Patient;

    i.  Falsely documented Alcoholic Liver;

    j.  Falsely documented Alcohol Damage in Colon;

    k.  Falsely documented Past Alcohol Abuse;

    l.  Falsely documented no alternative therapy options or alternative therapy
        stated as offered;

    m.  Falsely documented discussed the procedure and risks;

    n.  Ordering a blood test without disclosure on 11-year-old child for
        chylamida possibly trying to make her look sexually active and never
        discussing the order with the parents before or after;

    o.  Falsely stating at 4-5 years old the youngest daughter had a genital exam
        in a OU physicians doctors appointment when she did not —both parents
        there. The very documentation of such a false occurrence was done to
        defame parental character.

    p.  Falsely documenting anorexia as a Mental Illness instead of a side effect
        of Chronic Physical Illness and untreated infection;

    q.  Falsely documenting obesity instead of Metabolic Bone Disease or Syndrome,
        never ruled out acromegly from neuroendocrine Illness, Cancers, Infections
        etc.;

    r.  Falsely placing a subscription to a virtual trainer on a plaintiff's email
        account;

    s.  Falsely placing a Hot Bench Show Inquiry in the plaintiff mother's name to
        defame her with a judge as she sued in district court for the unlawful
        insurance plan change and harassment of the family;

    t.  Documented a false accusation, Does not like to play sports, parents made
        him;

    u.  False documentation, reporting fine off of IG therapy;

    v.  False documentation, cancer treated with radiation;

    w.  False documenting pain and heart changes/arrythmias as anxiety or anger
        instead, so often the source of the pain was not found or treated and left
        to occur again;

    x.  False reporting certain immune lab values that were not abnormal as normal

when on therapy that mitigates the levels and avoiding abnormal other;

y.  Falsely adding stipulations, revising or issuing new versions on IEP and 504 documents without the agreement of the team, falsely changing insurance plans in the calendar year;

z.  Forcing the student's physicians to change parameters at school to have the student appear to need less care at school, not have documentation for care needs without the consent of the patient and parent with no waived consent;

aa. Limiting plumbing repairs or doing repairs half way according to inspecting efforts because the family was told by Mullin Plumbing they thought the family did not have a lawyer to do anything about it;

bb. Harassment during and after bankruptcy because the family was told it was assumed the family did their bankruptcy themselves and did not have a lawyer to represent them;

cc. Excusing false and purposeful misreporting in medical records, state records and school records falsely as errors;

dd. And other misuses of test findings and false reporting of normal by moving parameters to suit the falsification or not disclosing the abnormal findings;

ee. And more to be found in discovery.

In summary there has been wrong and Oklahoma Keepers intent was to begin to try to tell it here or to show in some way it is more than this trial to narrow and present. There has been causation shown in Corporation Commission precedent under attorney Scott Poynter in his clients vs. New Dominion case mentioned above, there are hundreds of documents provided in plaintiffs exhibits as a body of evidence to prove both the wrong of the exposure and the wrong of the predicate events from government and individual culpable persons in health and elsewhere, there are other precedent cases to follow, recorded events are provided in exhibits when he said/she said is not enough, letters mailed, faxed letters of responses to harassment and phone calls documented, over years. The other side lied, cheated and stole from the logical (mostly incapable of lying) plaintiff family to include minor children. They, as the self appointed reign over the family's fate, deprived the family of due process with no plans of ever changing it. The courts have allowed the criminal acts to prevail against the family for years now, causing more harm.  It is just a case now where a judge needs to provide a decision for relief, there is reference in Social Security cases to see the other side's documents that replace "lost documents of truth" to give some sort of due process to the defendants to allow the defense to tell their made up stories they fought so hard to create and likely spent thousands to deprive the family of their truth. But here and now the family requires relief to get the care they need, to get insurance and purse string holders out of their lives to stop the deceit and get back their lives as best they can after being poisoned and left harmed for so, so, long.

As American Citizens, Oklahoma Keepers as a group asks the Federal court to end the health games of organized crime, to give the family back their rights to choose to continue their pursuit of happiness as they were before and more in order to heal, live in peace free of harassment and falsehoods, to help others and themselves since the State government has not, will not and now cannot because their in too deep, they can only seem to engage in crime or deceit. The State seems it would never ask for Federal help for their health mess and have instead blamed it on their people, never in support of the public interest regardless of their beliefs. And finally, we ask our government to

continue to find a way to really clean the air and water and to keep repairing the
infrastructure because it is true the re-exposure can be more deadly and the imbalances
or organic and inorganic chemistry can kill in an instant. Please make water jobs
important for people who want important jobs to remove the volatility of solvents and to
build an industry out of safely dissolving waste.  But above all treat our people for the
volatility caused to include the healing crisis that will happen as the body detoxes and
releases the chemicals or is re-exposed again.

With today's technology why have we not been building in leak detection and water testing
internally into our infrastructure? If we want pipelines and gas drilling why did we not
make them state of the art to stop leaks, properly deal with waste and shut down when
needed, or build in technology to answer any question we might have? Why instead must we
use technology to violate the lives of our people to invade their privacy or put false
things in their records or send bad people to take a child's blood but not to secure,
care for and protect our natural resources as the law says event he State of Oklahoma
must do?

And finally if this is not wanted in Federal Court, or the relief amount seems a problem
or too much then the parties in charge of public interest should not have sought to
block, to punish or harm the good family for fighting for their lives of their children
for staying in tune with their needs and stumbling upon truth while following their
physician's plans. It would have cost the State and Insurers as the "they" much less to
just keep helping the family manage illness and make repairs or ask for Federal help to
improve infrastructure. Please think about how much was spent to create alternate fact
about the family when that could have been used to control illness and at least be
treated in the way their friends and family were being treated. The plaintiff family has
a residence of rental, but wants to stay safe through the federal court's decision and
beyond so they ask for protection to keep bad actors from paying off or harming their
landlord or from harming the plaintiff family or their pets in any way. Oklahoma Keepers
cannot afford a private PO Box as they used in the district court it maybe did not
protect the family from bad actors then. The plaintiff family needs a good holiday
season, it has always brought them all great joy to remind them of the family's
surrounding love and it needs to become that way again as they miss an important
matriarch and others, wrongfully taken too soon. As it is known the defendants are quite
skilled and have large budgets to use in legal harassment why they deter representation,
the family will be ready to protect from the defendants false service and litigation
claims and offers the fax (if the phone line is able to remain in tact) to be sure the
plaintiff family has what is needed if the court continues to allow the defendants to
proceed in the harassment, delays and denials even using litigation now.


Oklahoma Keepers
1009 Elmwood St
Norman OK 73072

(918)851-5059   phone/wire
(405)701-2561   fax/wire
------------------------------- ------------------------------

Erika L. Dugan          Marc W. Dugan      Hailey L. Dugan         Carlin I. Dugan          Dugan
DATE: 11/13/17          DATE: 11 13 17     DATE: 11/12/2017        DATE: 1/13/2017          11/13/17